**2018 UT App 130**

## THE UTAH COURT OF APPEALS

KAREN BERGMANN,
Appellee,
*v.*
EUGENE D. BERGMANN,
Appellant.

Opinion
No. 20160217-CA
Filed June 28, 2018

Fourth District Court, Provo Department
The Honorable James R. Taylor
No. 144400815

Emily Adams, Attorney for Appellant

Thomas J. Burns and Philip M. Ballif, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS
concurred.

CHRISTIANSEN, Judge:

¶1      Eugene D. Bergmann and Karen Bergmann, now known
as Karen Christensen, divorced by bifurcated decree in May
2015. The trial court reserved several issues for trial, including
the legal effect of a premarital agreement (the Premarital
Agreement) the parties entered into in 2001 and a subsequent
agreement they executed in 2011 (the 2011 Agreement). In
January 2016, the trial court issued its amended findings of fact
and conclusions of law, which addressed all of the remaining
issues. Bergmann moved to alter or amend judgment, which the
court denied. Bergmann now appeals from the denial of that
motion. We affirm and remand for the limited purpose of

calculating Christensen's reasonable attorney fees incurred on appeal.

## BACKGROUND

¶2    Bergmann and Christensen married in 2001. Before they married, the parties executed the Premarital Agreement, which provides, in relevant part:

> 4.02 Living Expenses. During their marriage, the parties shall establish a joint checking account which will be the fund used for basic family living expenses, such as home mortgage payments, public liability and content insurance, utilities, property taxes, property maintenance as to the primary residence . . . , together with food and similar basic living expenses. Each party shall make deposits to such joint checking account in such portions and such amounts as from time to time may be determined necessary by them for such purposes. Initially, the parties have determined that Eugene will contribute $4,000 per month and Karen will contribute $2,000 per month, plus Social Security payments received by her.[1] The parties recognize that each is able to make such contributions. . . . If the parties cannot agree as to the contribution to be made hereunder, each party shall bear the costs of his or her respective living expenses, unless one of the parties determines to pay more than his or her share which he or she shall be entitled to do.

---

1. Christensen's social security benefits averaged $2,000 per month.

¶3     After they married, the parties operated for years without referring to the Premarital Agreement. During the marriage, the parties agreed that they would contribute equally to the family budget, and they both contributed to the joint checking account for basic family living expenses. Consistent with that understanding, the parties tracked their contributions and withdrawals in a spreadsheet available to both of them. Over time, Christensen's contributions were significantly larger than Bergmann's. Bergmann acknowledged this fact in a November 2010 email to Christensen, in which he stated that he was approximately $159,000 "in debt" to her.

¶4     Shortly after the 2010 email, Bergmann indicated to Christensen that he needed money to help pay the basic family living expenses. Because Christensen had paid more of the basic family living expenses over the years than Bergmann, she agreed to give Bergmann $20,000 only if Bergmann agreed to provide "some assurance that [she] would get paid back." Bergmann suggested "that he would transfer [his] equity [in the parties' marital home] to [Christensen] upon the sale of the home." On January 7, 2011, the parties entered into the 2011 Agreement, which provides,

> **AGREEMENT**
> January 7, 2011: It is agreed that Eugene Bergmann and Karen Bergmann share equal ownership in their home . . . . It is also agreed to that Eugene will assign an amount of his equity to Karen in the amount of 170,000 dollars. This . . . amount constitutes an[] approximate amount of additional joint expenditures that Eugene has agreed to and is owing to Karen. This exact amount will be verified at some time in the future in a spreadsheet which they will both come to a further mutual agreement on. This spreadsheet will then be memorialized into a more formal agreement to [supersede] this one.

Two days later, Christensen deposited $20,000 into the parties' joint checking account, and Bergmann used the money to pay the basic family living expenses.

¶5     Christensen filed for divorce in 2014. The trial court entered a bifurcated decree of divorce, dissolving the marriage and reserving several issues for trial. The two primary issues at trial were (1) whether the Premarital Agreement required the parties to make equal contributions to the basic family living expenses, and (2) whether, under the terms of the 2011 Agreement, Bergmann was required to assign to Christensen $170,000 of his initial one-half share of the proceeds from the sale of the parties' marital home.

¶6     The trial court held a one-day bench trial, at which both parties testified. The court determined that the Premarital Agreement was an enforceable agreement but that Section 4.02 of the Premarital Agreement "does not say that [Bergmann and Christensen] are each going to be exactly responsible for fifty percent of the basic family living expenses forever and through the life of the Premarital Agreement." The court noted that throughout the marriage, the parties had "not worr[ied] about the technicalities of the Premarital Agreement. In fact, they operated for years without referring to a copy of it." Although the parties had maintained a spreadsheet tracking their individual contributions to the joint checking account, the court found that "this practice of handling basic family living expenses did not create a substitute contract that obligated them to divide and pay basic family living expenses on a fifty-fifty basis forever." The court found that during the course of the marriage, the parties had some disputes about who would pay for what, but the parties "work[ed] this out when they entered into the [the 2011 Agreement]."

¶7     The court observed that, in the 2011 Agreement, the parties acknowledged that Christensen had paid more of the basic family living expenses than Bergmann, that Bergmann owed Christensen "an unspecified amount" of money, and that

Bergmann agreed to assign to Christensen $170,000 of his equity share in the parties' marital home on this basis. The court then determined that the 2011 Agreement was an enforceable agreement, supported by consideration. Specifically, at Bergmann's request, Christensen transferred $20,000 into the parties' joint checking account to help pay past due and upcoming basic family living expenses, and, in return, Bergmann assigned to Christensen $170,000 of his share of equity in the marital home. The court ultimately concluded that the 2011 Agreement was not a modification to the Premarital Agreement but that it was "an additional, enforceable agreement anticipated by the Premarital Agreement."

¶8    Accordingly, the court awarded Christensen $170,000 from Bergmann's initial one-half share of the proceeds from the sale of the marital home. The court also awarded Christensen her attorney fees incurred in connection with responding to a pretrial motion in limine Bergmann had filed, concluding that the motion was "frivolous and patently inappropriate." The court determined that the parties were otherwise responsible for their own attorney fees and costs.

¶9    After trial, Bergmann moved to alter or amend the judgment pursuant to rule 59(a)(7) of the Utah Rules of Civil Procedure. *See* Utah R. Civ. P. 59(a)(7) ("[A] new trial may be granted to any party on any issue for any of the following reasons: . . . that the verdict or decision is contrary to law or based on an error in law."). In his motion, Bergmann asserted that when the parties entered into the 2011 Agreement, "both parties believed that there was a contractual duty under [the Premarital Agreement] that they each pay 50/50 for all joint living expenses." According to Bergmann,

> [i]nasmuch as the Court ruled that in fact there was no legal obligation for [Bergmann] to reimburse [Christensen] for 50% of all marital expenditures, where [the 2011 Agreement] was fundamentally based on the mutual mistake that there was a

contractual obligation under [the Premarital Agreement] for a 50/50 responsibility of family living expenses, this contract should not be enforced by the Court.

Bergmann also asserted that the 2011 Agreement was based on the parties' mutual mistake regarding the amount Bergmann owed Christensen. Bergmann requested that the court "reverse its finding that [Christensen] receive[] $170,000 from [Bergmann] and order that [Christensen] return those funds to him." Christensen filed a response to the motion to amend, asserting that Bergmann's motion was "merely a rehash of closing argument." She also requested her attorney fees incurred in "having to oppose [Bergmann's] motion."

¶10    The trial court denied Bergmann's motion, stating:

> The arguments [Bergmann] has advanced are not new to the case. He does not seek to present new evidence. There was no[] surprise in the sense that evidence or theories were allowed to be presented at trial that could not have been anticipated by the parties in preparation for the trial. The Court disagrees with [Bergmann's] characterization about the intent and understanding of the parties as they attempted to define their marital relationship through agreement and practice. The Court is satisfied that the ruling announced from the bench and memorialized in the subsequently prepared findings and decree are legally and factually correct.

The court awarded attorney fees to Christensen related to the post-trial motion, concluding that Bergmann's motion to amend "did not materially advance the matter and required a careful response from [Christensen's] counsel." Bergmann appeals.

ISSUES AND STANDARDS OF REVIEW

¶11 Bergmann contends that the trial court abused its discretion when it denied his rule 59 motion to alter or amend. Within this argument, Bergmann asserts that the trial court erred when it ruled that the 2011 Agreement was enforceable, because the parties were operating under a mutual mistake of fact (1) that the Premarital Agreement required equal contributions and (2) regarding the amount Bergmann owed Christensen.

¶12 "Generally, we afford trial judges wide latitude in granting or denying rule 59 motions." *Sanpete Am., LLC v. Willardsen*, 2011 UT 48, ¶ 28, 269 P.3d 118. "We grant this discretion because the trial court, having heard the evidence, typically is in a better position to determine whether the grant or denial of a rule 59 motion is warranted." *Id.* "Consequently, we generally disturb a trial court's grant or denial of a rule 59 motion only if it constitutes an abuse of discretion." *Id.* To the extent that our review turns on facts presented at trial, we defer to the trial court's underlying findings of fact, "which shall not be set aside unless clearly erroneous." *Id.* ¶ 29 (citation and internal quotation marks omitted). "Findings are clearly erroneous if they are against the clear weight of the evidence or if the appellate court reaches a definite and firm conviction that a mistake has been made." *Sorenson v. Kennecott-Utah Copper Corp.*, 873 P.2d 1141, 1147 (Utah Ct. App. 1994). "The issue of mistake of fact involves factual determinations and conclusions of law. We review factual determinations for clear error and conclusions of law for correctness." *Deep Creek Ranch, LLC v. Utah State Armory Board*, 2008 UT 3, ¶ 10, 178 P.3d 886.

ANALYSIS

I. Mutual Mistake

¶13 Bergmann contends that the parties "entered into the 2011 Agreement operating under a mutual mistake of fact" and that

the trial court "erred when it did not rescind the 2011 Agreement."[2] He first asserts that "the parties executed the 2011 Agreement erroneously believing that the Premarital Agreement required them to equally contribute to basic living expenses." Alternatively, he asserts that the parties entered into the 2011 Agreement operating under a mutual mistake about the amount Bergmann owed Christensen.

¶14 "A mutual mistake occurs when both parties, at the time of contracting, share a misconception about a basic assumption or vital fact upon which they based their bargain." *Cantamar, LLC v. Champagne*, 2006 UT App 321, ¶ 38, 142 P.3d 140 (citation and internal quotation marks omitted). "Mutual mistake of fact

---

2. Christensen contends that Bergmann "waived any possible mutual mistake argument" by failing to plead the defense with particularity in his response to Christensen's petition for divorce. The record indicates that Bergmann raised the issue of mutual mistake at trial and that Christensen objected on the same basis she asserts now. The trial court stated:

> Well, I don't want to say that [Bergmann is] necessarily going to prevail on those defenses, but the fact of the matter is [that] this is equity, and those defenses are largely equitable arguments. It comes down to what . . . can be argued as fair under the circumstances. So I'm not too exercised that they weren't pled in advance. I'm not sure they apply in this case.

In its amended findings of fact and conclusions of law, the court did not expressly rule on Bergmann's mutual-mistake argument. But in denying Bergmann's motion to alter or amend, which was based on the theory of mutual mistake, the court stated that Bergmann's arguments "are not new to the case" and that his "evidence or theories were allowed to be presented at trial." Because the trial court apparently considered Bergmann's mutual-mistake defense, we are not persuaded by Christensen's contention that Bergmann waived the defense.

makes a contract voidable and is a basis for equitable rescission." *Robert Langston, Ltd. v. McQuarrie*, 741 P.2d 554, 557 (Utah Ct. App. 1987) (citation omitted). "The proponent of a mutual-mistake claim must prove the elements by clear and convincing evidence." *High Desert Estates LLC v. Arnett*, 2015 UT App 196, ¶ 11, 357 P.3d 7. The trial court did not explicitly address Bergmann's mutual-mistake arguments in its amended findings of fact and conclusions of law, but in its denial of Bergmann's motion to alter or amend judgment, the court "disagree[d] with [Bergmann's] characterization about the intent and understanding of the parties as they attempted to define their marital relationship through agreement and practice."

A.     Equal Contributions

¶15    Bergmann asserts that the parties entered into the 2011 Agreement "because they believed the Premarital Agreement required equal contributions." The trial court determined that section 4.02 of the Premarital Agreement "does not say that [Bergmann and Christensen] are each going to be exactly responsible for fifty percent of the basic family living expenses forever and through the life of the Premarital Agreement." Bergmann does not challenge this finding on appeal; indeed, he "embraces that finding on appeal." Instead, Bergmann challenges the court's "next step," i.e., the court's determination that the 2011 Agreement was enforceable and its "implied[]" rejection of his mutual-mistake argument.

¶16    According to Bergmann, "[e]verything in this case is underpinned by the parties' belief that the Premarital Agreement required equal contributions." Bergmann asserts that he "clearly testified that he signed the 2011 Agreement because he believed the Premarital Agreement required him to contribute equally to basic family living expenses." He further asserts that Christensen's testimony demonstrated that she expected Bergmann to contribute equally to the basic family living expenses and that the only reason Christensen gave for that

expectation "was the terms of the Premarital Agreement." We are not persuaded.

¶17    To begin with, the evidence is, at best, conflicting as to whether the parties entered into the 2011 Agreement based on the mistaken belief that the Premarital Agreement required them to contribute equally to the family's basic living expenses. *See generally High Desert Estates LLC v. Arnett*, 2015 UT App 196, ¶ 14, 357 P.3d 7 ("[W]e will not reweigh . . . conflicting evidence so long as there is evidence to support the trial court's findings."). Bergmann testified that at the time he entered into the 2011 Agreement, he believed he was "required to pay 50/50 of all living expenses" and that the 2011 Agreement was a result of that mistaken belief. He further testified that he believed he was indebted to Christensen based upon the terms of the Premarital Agreement.

¶18    However, as Christensen correctly observes, Bergmann also testified that he entered into the 2011 Agreement as a form of estate planning:

> I signed [the 2011 Agreement] to essentially—in the event of my death, you know, that there would be no problem with [Christensen] to have the whole house. We had a $170,000 mortgage on the house still, and it, you know, seemed reasonable. Then we also, you know, didn't have all our real numbers.
>
> So we just had an approximate . . . debt that was 159 or something like that, and we just assigned that number to it, so—in the event of something happening. Then at some future date we would do the hard work and sort of figure out what the real numbers were, the real contributions and that sort of thing; but it was based on a 50/50 understanding.

Additionally, Bergmann acknowledged at trial that shortly before the parties signed the 2011 Agreement, he had asked Christensen to put an additional $20,000 into the parties' joint checking account and that, in the 2011 Agreement, he had agreed to assign to Christensen $170,000 of his equity share in the parties' marital home.

¶19 Christensen's testimony on the matter also does not unequivocally establish that she entered into the 2011 Agreement based on an assumption that the Premarital Agreement required the parties to contribute equally to basic family living expenses. Indeed, although Christensen's testimony demonstrates that she expected the parties to contribute equally to basic living expenses, Christensen never explicitly stated that this expectation was based on the Premarital Agreement. Rather, Christensen stated (1) she expected Bergmann to contribute equally from the start of their marriage; (2) Bergmann failed to meet that expectation, forcing her to contribute more to basic family living expenses; (3) she expected him to make her whole, and Bergmann had "sent [her] many messages that he would make [her] whole"; and (4) when Bergmann needed $20,000 and had not followed through on his promises to make her whole thus far, she required more assurance that she would get paid back.

¶20 In any event, regardless of the source of the parties' belief that they were required to make equal contributions, the record demonstrates that the parties conducted their marriage with the understanding that they would contribute equally to basic family living expenses. The trial court found, and Bergmann agrees, that the parties operated for years without referring to the Premarital Agreement and that they did not worry about the technicalities of the Premarital Agreement. The trial court also found that the parties worked together to pay basic living expenses. The record bears this out—when Bergmann either could not or would not contribute to the basic family living expenses, Christensen rose to the occasion and paid those expenses so that the parties would not overdraw on their joint

account. Additionally, throughout their marriage, the parties maintained a detailed spreadsheet related to the basic family living expenses, tracking transactions for the expenses from the joint checking account as well as from credit cards tied to their personal, separate funds. This practice of working together to pay basic living expenses and of keeping detailed records of their contributions demonstrates the parties' understanding and expectation that they would contribute equally to basic living expenses.

¶21 Moreover, and perhaps most importantly, the fact that the parties understood that they would contribute equally (whether based on the Premarital Agreement or from their course of conduct throughout the marriage) does not undermine the legitimacy of the 2011 Agreement or the fact that, at the time the parties entered into the 2011 Agreement, they shared an understanding that Bergmann owed Christensen money and that Christensen needed to be made whole. The trial court found that in the 2011 Agreement the parties acknowledged that Christensen had paid more of the basic family living expenses than Bergmann and that there was an "unspecified amount" that Bergmann owed Christensen. The trial court determined that it was "because of this that [Bergmann] agreed in the [2011 Agreement] to assign to [Christensen] $170,000 of his equity share in the marital home." The court further determined that Christensen had transferred $20,000 into the joint checking account to help Bergmann pay past due and upcoming basic living expenses and that, in exchange, Bergmann had assigned $170,000 of his equity share of the parties' home. The court concluded that the 2011 Agreement was enforceable as a separate agreement, that the agreement was supported by separate consideration, and that both parties had changed their position in reliance on the agreement. There is sufficient evidence in the record to support the court's findings.

¶22 Specifically, the record demonstrates that when Bergmann needed the $20,000 and approached Christensen for help, both parties understood that Christensen had contributed

more to the basic family living expenses than Bergmann. Christensen testified that early on in the parties' marriage, she started contributing more when Bergmann "couldn't or wouldn't" contribute. She stated that when they had bills to pay, Bergmann "would have some reason why he couldn't" contribute, and the burden was on Christensen to keep the joint account from being overdrawn. In his November 2010 email, Bergmann acknowledged that he was approximately $159,000 "in debt" to Christensen, and he apologized for things "being more of a mess" on his side financially.

¶23 In testifying about the events that "led up to the execution" of the 2011 Agreement, Christensen testified that when Bergmann approached her about the $20,000, she had not been "seeing any results in [Bergmann] trying . . . to make [her] whole." Consequently, before she was willing to give Bergmann the money, she sought "something more tangible than just a promise that [she] would be made whole." Accordingly, the parties agreed that "if [Christensen] could have some assurance that [she] would get paid back," she would make the $20,000 deposit into the joint checking account. Christensen testified that Bergmann suggested that he transfer $170,000 of his equity share in the parties' marital home in exchange for the $20,000. On January 7, 2011, the parties entered into the 2011 Agreement, in which Bergmann assigned his $170,000 equity share of the parties' home to Christensen. Two days later, on January 9, 2011, Christensen deposited $20,000 into the parties' joint checking account, and Bergmann used the funds to pay his obligations.

¶24 Bergmann has not demonstrated that the trial court's findings regarding the 2011 Agreement lack evidentiary support or that those findings are clearly erroneous. Consequently, Bergmann has failed to demonstrate that the parties entered into the 2011 Agreement based on a mutual mistake of fact. We therefore conclude that the trial court did not err in enforcing the 2011 Agreement, and did not abuse its discretion in denying Bergmann's motion to alter or amend judgment on this basis.

B.      The Amount Bergmann Owed

¶25    As an alternative to his first argument, Bergmann contends that "the parties entered into the 2011 Agreement operating under a mutual mistake about the amount Mr. Bergmann owed Ms. Christensen."

¶26    The 2011 Agreement stated, in relevant part, that the $170,000 represented an

> approximate amount of additional joint expenditures that [Bergmann] has agreed to and is owing to [Christensen]. This exact amount will be verified at some time in the future in a spreadsheet which they will both come to a further mutual agreement on. This spreadsheet will then be memorialized into a more formal agreement to [supersede] this one.

According to Bergmann, the parties entered into the 2011 Agreement "believing that Mr. Bergmann's debt to Ms. Christensen totaled $170,000," but "the evidence adduced at trial shows that Mr. Bergmann . . . owed Ms. Christensen much less."

¶27    In support of his claim that he owed Christensen less than $170,000, Bergmann observes that Christensen hired an accountant to help calculate the amount Bergmann owed and that the accountant determined that Christensen had contributed approximately $168,000 more than Bergmann to the parties' joint account. Bergmann asserts that it is undisputed that the accountant's figure "did not credit Mr. Bergmann for approximately $22,000 in federal tax withholdings" or "include approximately $41,000 of Mr. Bergmann's contributions that Ms. Christensen characterized as withdrawals," thus demonstrating that "Bergmann, did not, in fact, owe . . . Christensen $170,000." Bergmann further asserts, without citation to the record, that he "presented undisputed evidence that [he] owed tens of thousands of dollars less than $170,000."

¶28    The trial court found that, in the 2011 Agreement, the parties had acknowledged that Christensen had contributed more to the parties' basic family living expenses than Bergmann and had acknowledged that Bergmann owed Christensen an "unspecified amount." In its oral ruling, the court determined that the parties had "settled for $170,000" and that Christensen "took [$]170,000 to cancel what [Bergmann] owed at that point, and that made it even from then on." The court ultimately concluded that Bergmann was required to pay Christensen the $170,000 they had agreed to in the 2011 Agreement. In so ruling, the court explicitly rejected both parties' attempts to alter the $170,000 amount stated in the 2011 Agreement.

¶29    Specifically, at trial, Christensen testified that she had hired an accountant to help her determine the exact amount Bergmann owed her. Christensen described the information she had provided to her accountant and ultimately relied on the figures prepared by her accountant (and received as evidence by the trial court) to support her testimony regarding how much Bergmann owed her. Christensen's accountant testified that Christensen had contributed approximately $336,000 more than Bergmann to the parties' joint checking account and that Bergmann's share of this difference was approximately $168,000. However, the court rejected both Christensen's and her accountant's testimony "about the family expenses," stating that it "did not find [that testimony] to be particularly credible." *See generally Henshaw v. Henshaw*, 2012 UT App 56, ¶ 11, 271 P.3d 837 ("It is within the province of the trial court, as the finder of fact, to resolve issues of credibility."). And with regard to the accountant specifically, the court found that his "conclusions and tables" were "tainted" by Christensen's "assumptions and directions about what was a family expense [and] what was not."

¶30    The court also rejected Bergmann's testimony regarding several out-of-pocket expenses he had allegedly incurred in getting the marital home ready to sell and which he believed should offset his debt to Christensen. Bergmann testified that he

had spent "101.25 hours" working on the parties' marital home, totaling $4,716.85 in out-of-pocket expenses and "over $11,000" in labor. He also submitted numerous receipts into evidence.[3] But the court found that Bergmann's testimony was not "complete or credible enough." The court explained that Bergmann was "vague and unspecific about [his] out-of-pocket expenses" and that it was hard to distinguish between the work that Bergmann did "that he normally would have contracted for and work that a homeowner would normally do to protect their own asset." Concluding that Bergmann provided "[n]othing reliable" regarding the value of that work, the court "disregard[ed] that testimony."

¶31    The resolution of this issue required the trial court to determine the credibility of each witness's testimony. On appeal,

> we give great deference to a trial court's determinations of credibility based on the presumption that the trial judge, having personally observed the quality of the evidence, the tenor of the proceedings, and the demeanor of the parties, is in a better position to perceive the subtleties at issue than we can looking only at the cold record.

*Sauer v. Sauer*, 2017 UT App 114, ¶ 6, 400 P.3d 1204 (citation and internal quotation marks omitted). "Consequently, in all actions tried upon the facts without a jury, findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *Id.* (citation and internal quotation marks omitted).

¶32    Here, the record demonstrates that the trial court considered testimony by Christensen, Christensen's accountant,

---

3. The court received only twenty pages of Bergmann's documentation into evidence, concluding that the rest was inadmissible.

and Bergmann regarding the amount Bergmann owed Christensen, and it elected to disregard that testimony as not credible. Bergmann has failed to challenge the court's credibility determination, much less demonstrate that it was clearly erroneous, and we will "defer to that credibility determination." *See id.* ¶ 7. Moreover, although Bergmann asserts that the parties mistakenly believed that he owed Christensen $170,000, the trial court determined that the parties had "*settled* for $170,000," i.e., that the $170,000 amount represented a compromise between the parties. (Emphasis added.) Bergmann has not challenged this finding on appeal, and he has therefore failed to demonstrate that it is clearly erroneous. *See* Utah R. Civ. P. 52(a)(4) ("Findings of fact . . . must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the credibility of the witnesses."). By extension, he has failed to demonstrate that the 2011 Agreement was the product of a mutual mistake.

¶33 In any event, the fact that the 2011 Agreement contemplated that the parties could revisit the amount stated indicates that the parties did not necessarily agree on the amount Bergmann owed (as opposed to their definite agreement that Bergmann did, in fact, owe Christensen something), but that they settled on $170,000 for the time being, reserving the right to revisit the issue in the future if they truly perceived that Bergmann owed Christensen a different amount. Yet in the more than three years between the execution of the 2011 Agreement and Christensen's filing for divorce, the parties never revisited the issue, and both parties ultimately failed to present any credible evidence in their respective efforts to alter the amount Bergmann owed.

¶34 Bergmann has not demonstrated that the 2011 Agreement was the product of a mutual mistake as to the amount he owed. Consequently, the trial court did not err in enforcing the 2011 Agreement, nor did it abuse its discretion in denying Bergmann's motion to alter or amend judgment.

## II. Attorney Fees

¶35 Christensen contends that she "is entitled to the fees and costs she has incurred in defending against [Bergmann's] appeal." "Generally, when the trial court awards fees in a domestic action to the party who then substantially prevails on appeal, fees will also be awarded to that party on appeal." *Osguthorpe v. Osguthorpe*, 872 P.2d 1057, 1059 (Utah Ct. App. 1994) (citation and internal quotation marks omitted). The trial court awarded Christensen her attorney fees incurred in responding to Bergmann's motion to alter or amend judgment, concluding that Bergmann's motion "did not materially advance the matter and required a careful response from [Christensen's] counsel."[4] Bergmann has not challenged the trial court's attorney-fee award, and Christensen correctly observes that Bergmann's arguments on appeal are "nearly identical" to those he presented in his motion. Accordingly, because Christensen has prevailed on appeal, we award Christensen her reasonable attorney fees incurred in connection with this appeal in an amount to be determined by the trial court on remand.[5]

## CONCLUSION

¶36 We affirm the trial court's ruling that the 2011 Agreement was enforceable and not the product of a mutual mistake. We

---

4. At trial, the court also awarded Christensen her attorney fees incurred in responding to Bergmann's motion in limine, concluding that Bergmann's motion in limine was "frivolous and patently inappropriate." The court determined that the parties were otherwise responsible for their own attorney fees and costs.

5. Utah Rule of Appellate Procedure 34(a) provides that "if a judgment or order is affirmed, costs shall be taxed against [the] appellant unless otherwise ordered." We therefore also award Christensen her costs reasonably incurred on appeal.

therefore conclude that the trial court did not abuse its discretion in denying Bergmann's motion to alter or amend judgment. We remand this case to the trial court for the limited purpose of calculating Christensen's attorney fees reasonably incurred on appeal.

———————