**2024 UT App 25**

---

## THE UTAH COURT OF APPEALS

---

STATE OF UTAH, IN THE INTEREST OF H.H. AND N.H.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

---

T.H. AND D.H.,
Appellants,
*v.*
STATE OF UTAH,
Appellee.

---

Opinion
Nos. 20220803-CA and
20220820-CA
Filed February 29, 2024

---

Second District Juvenile Court, Farmington Department
The Honorable Jeffrey J. Noland
Nos. 1163279 and 1163280

---

Scott L. Wiggins, Attorney for Appellant T.H.

Emily Adams, Sara Pfrommer,
Hannah Leavitt-Howell, Marjorie Christensen, and
Melissa Jo Townsend, Attorneys for Appellant D.H.

Sean D. Reyes, Carol L.C. Verdoia, and
John M. Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

---

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JOHN D. LUTHY
concurred.

---

HARRIS, Judge:

¶1 After a lengthy bench trial, the juvenile court found grounds to terminate the parental rights of D.H. (Father) and T.H. (Mother) (collectively, Parents) regarding their two youngest

children, H.H. (Hannah) and N.H. (Noah).[1] The court found that Father was an unfit parent because he had subjected four of his children, including Hannah and Noah, to "serious emotional abuse," inflicted through a strict and intimidating parenting style, that "resulted in two of the children considering suicide as an option to end the maltreatment." As to Mother, the court found that her continued support of Father rendered her incapable of "exercising proper parental care."

¶2    In its initial post-trial ruling, the court determined that it was in Hannah's and Noah's best interest for Father's parental rights to be terminated, but that it was not in their best interest for Mother's rights to be terminated. Instead, the court imposed a permanent guardianship arrangement in favor of an adult sibling (Oldest Sister). Later, however, after the guardian ad litem (the GAL) filed a motion for reconsideration, the court amended its initial ruling and ordered Mother's rights terminated as well.

¶3    In separate appeals that we consider together in this opinion, Parents challenge the termination of their parental rights on several grounds, asserting chiefly that the "juvenile court process" that led to termination violated their constitutional rights and that the court erred in concluding that termination of their parental rights was strictly necessary. For the reasons that follow, we reject all of Parents' arguments and affirm the court's termination order.

---

1. Hannah and Noah are pseudonyms, which we elect to employ here to avoid continued and potentially confusing repetition of similar-sounding initials.

## BACKGROUND[2]

### *The Family Situation and the Initial Removal*

¶4    Parents are the natural parents of six children: four daughters and two sons. By the time this case was initiated in 2018, the two oldest children (Oldest Sister and Older Brother) had reached adulthood and were living on their own. Some years earlier, when she turned eighteen but while she was still in high school, Oldest Sister moved out of Parents' home because, in her view, Parents had created "a very horrible living situation" that left her "scared to go home." In 2013, when Older Brother was seventeen and a junior in high school, he also elected, for apparently similar reasons, to move out of the family home; at that point, he moved in with Oldest Sister—who is some nine years older than Older Brother—and her husband (Brother-in-Law). The four younger children—Chloe, Felicity,[3] Hannah, and Noah—all still lived with Parents.

¶5    In May 2018, Utah's Division of Child and Family Services (DCFS) received a report that Chloe—who was fifteen at the time—had confided to a teacher that her home life was so unbearable that she was considering suicide, on a "constant basis," as a means of escape. As Chloe described it, Parents were constantly screaming and fighting and taking their anger out on the children. Physical violence, both real and threatened, and verbal abuse were tools that Parents—especially Father— frequently used against the children. Father also forced the

---

2. In cases like this one, where parties are appealing the determination made following a termination trial, "we recite the facts in the light most favorable to the juvenile court findings." *In re S.T.*, 2022 UT App 130, n.2, 521 P.3d 887 (quotation simplified).

3. Chloe and Felicity are also pseudonyms.

children to do seemingly endless chores, and he required them to pay him for basic amenities like fresh food (as opposed to "expired" food storage), computer usage, and rides to school. Chloe told a DCFS caseworker that she was suicidal because "she couldn't handle being home alone with [Father] all summer."

¶6 Spurred by the report it received about Chloe's suicidal ideations, DCFS conducted an investigation during the summer of 2018. Among other things, it administered a "suicide severity" test to Chloe and concluded that Chloe scored "very high." When DCFS reported this score to Parents, they "both scoffed" and responded that Chloe was a "drama queen" who was "just trying to get attention." At the end of the investigation, DCFS made a supported finding of "emotional maltreatment" against Parents and offered them "voluntary services" to assist them in improving the situation. DCFS also spoke with Oldest Sister, who was familiar with the family dynamics and the living situation at Parents' home. Oldest Sister committed to keeping an eye on her siblings and promised to notify DCFS "if the situation escalated."

¶7 DCFS then notified Parents, by letter, of its "emotional maltreatment" finding. When Parents received this letter, they became "enraged" and responded by "blam[ing] the children" and acting "very vindictive" toward them. In particular, Parents warned the children that, "if they were to speak with authority figures," including "church leaders" or anyone at DCFS, about events occurring in the home, they would be "severely punished."

¶8 Notwithstanding this warning, in August 2018 the three younger daughters—Chloe, Felicity (then fourteen), and Hannah (then twelve)—sought guidance from one of their church "young women" leaders (YW Leader). The family—including Parents as well as all six of their children—are practicing members of The Church of Jesus Christ of Latter-day Saints, a church that has relatively structured youth programs with local lay leaders

assigned to provide supervision and guidance. Both YW Leader and the president of the family's local church unit (Branch President) had counseled the girls—without Parents' knowledge—to "contact one of [them] if things got too bad at home and they needed an escape or someone to talk to." When the girls sought YW Leader's advice, she brought them in to meet with Branch President in his office at the local church.

¶9      As the meeting between the girls and Branch President was nearing its end, Father—having gotten wind of the meeting—appeared at the church; Branch President observed that Father was very upset and "quite agitated," and Father demanded "to know what [the girls] were doing at the church." Father "backed [the] girls into a corner" of Branch President's office and "started angrily interrogating them" and "berating them in a loud, almost yelling tone" before then "turn[ing] on" YW Leader when she tried to intervene. The girls began "sobbing and begging him to stop." Branch President, perceiving that the girls "were terrified," also asked Father to stop, telling him that his behavior was "inappropriate." Father then "angrily" "turned on" Branch President, put a "finger in [his] face," and accused Branch President of "trying to divide his family." He also "unloaded on" Chloe, "telling her that she was nothing but a drama queen and that if she hadn't been threatening suicide just to get attention" the family "wouldn't be in this mess." His verbal assault was so fierce that Chloe "threw up her arms in front of her face" in an effort to protect herself. YW Leader was "shocked and quite upset" and "couldn't believe what she was seeing." Eventually, Father left the building, and after the incident, Branch President decided to take a step he'd never before taken in his years as a religious leader: he wrote a four-page single-spaced letter to DCFS describing the situation generally, and the incident at the church specifically, offering his view that the "terror and anguish the girls are experiencing" are "real" and that the situation requires attention. He requested that DCFS reopen the family's

case and that, "at a minimum," the girls "be given a chance to be evaluated by professional counselors."

¶10    Over the next few days, the situation in the family home continued to deteriorate. During this time, Chloe continued to talk about suicide, and she did so even more seriously; Brother-in-Law reported that Chloe was now saying that she had "a plan" for committing suicide. And Brother-in-Law reported that Felicity, for the first time, was also talking about suicide, even going so far as saying "it was the only way to escape this life as she could no longer deal with it." On at least one occasion during this time frame, Felicity contacted DCFS to provide additional information.

¶11    Also during this time period, Parents often "cornered" the girls at home, separated them into "different rooms," and "interrogat[ed]" them for "several hours" about whether they were "sharing information with" DCFS and, if so, what they had shared. During these interrogations, Parents would scream and yell, would threaten to send the children "to juvey," and would tell them that they would be responsible if the "family was destroyed" and that, in that event, the children would end up in "foster care" where they would likely "be beat[en] and raped."

¶12    On August 29, 2018, the day after an especially long evening interrogation, Felicity and Hannah went to school—which had just begun for the year—but were so distraught when classes ended that they were afraid to return home, so they contacted Brother-in-Law and asked him to pick them up. When Brother-in-Law arrived at the school, he found the girls "cowering" in the front office and "shaking uncontrollably," behavior Brother-in-Law considered uncharacteristic; they also would not "let go of each other's hands." Brother-in-Law later reported that Felicity was "panicked out of her mind to have to return home to the situation" there. Brother-in-Law took the girls to his house, and he contacted DCFS; he told the caseworker that

he "didn't feel comfortable letting them go home because" he was concerned they might "hurt themselves."

¶13    The DCFS caseworker assigned to the case traveled to Oldest Sister's house and spoke with the girls, and she determined that "the family situation had risen to a dangerous level." At that point, DCFS "sought and received a warrant for the removal" of all four minor children "from the custody and guardianship" of Parents. Later that evening, Parents arrived at Oldest Sister's house and were served with the removal warrant. DCFS officials, accompanied by law enforcement, informed Parents that the children had been removed from their home. The children were eventually officially placed with Oldest Sister and Brother-in-Law; Hannah and Noah have remained in that placement ever since, and Chloe and Felicity remained in that placement until they reached adulthood.

*The State's Petition and the Shelter Hearing*

¶14    The next day, the State filed a petition asking the court to award custody and guardianship of the children to DCFS. In its petition, the State discussed the situation in the home and asserted that both Chloe and Felicity had been having "suicidal thoughts and ideations" as a result. The petition included allegations of the constant chores Father required the children to perform, as well as Father's requirement that the children pay him for basic necessities. It also included detailed allegations of verbal abuse by Parents, asserting that they were "swearing and spitting" in the children's faces, calling them "little shits" and "worthless," and telling the girls in particular that they were "ugly" and that Parents "wishe[d]" they hadn't been born. The State alleged that Father used physical force as part of his dominion over the children, often "push[ing]" them and "pull[ing] the back of their hair." Mother would sometimes "threaten[] to kill herself" and then disappear, causing the children distress and creating "panic"

as they wondered whether Mother might have followed through with her threats. The State requested that the children be placed "in the custody and guardianship" of DCFS and that any visitation between Parents and the children be at the direction of DCFS and in consultation with a guardian ad litem.

¶15 At a shelter hearing held a few days later, the court considered evidence by proffer from several witnesses, including Parents, the four minor children, Oldest Sister, Brother-in-Law, the DCFS caseworkers, and Branch President.[4] At the conclusion of the hearing, the court found that the children were "suffering emotional harm" and there was "nothing and no services" that could be "placed into the home to ameliorate the harm." Accordingly, the court concluded that the children could "not be safely returned" to Parents and awarded temporary custody of the children to DCFS, with Parents to have supervised visitation. The court also appointed the GAL to represent the interests of the children, and it later appointed attorneys to represent Mother and Father, separately.

*The Failure of Group Therapy*

¶16 During the fall of 2018, the court held hearings in the case on nearly a weekly basis, as disputes arose over even rather basic things. For instance, the State wanted all four children to have a mental health assessment, but Parents objected; the court held a hearing and ordered that the evaluations take place and that Parents were not allowed to attend them. The evaluations eventually occurred, and the children began therapy—both individual and group therapy—with a counselor in October 2018. Some of the group therapy was designed to include Parents;

---

4. All four children waived the clergy testimonial privilege to allow Branch President to testify at this and other proceedings throughout this matter.

indeed, the court ordered that, for Chloe and Felicity, all visitation "shall be therapeutic until further order of the court."

¶17 At first, the children were reticent to even see Parents, much less participate in group therapy with them. The therapist facilitating the group therapy (Therapist) asked the children—prior to the appointments with Parents—if there were "things that [Therapist] could put into place" that would help them "feel comfortable" with the arrangement, and the children—"together as a collaborative process"—came up with a set of guidelines they thought would help. Among other things, the children asked that there be "no hugs" between them and Parents, "no talking about money," and "no talking about religion" or "church stuff." Therapist communicated these child-created guidelines to Parents on October 24, 2018, just prior to the first group therapy session.

¶18 Parents objected to these guidelines, especially the "no talking about religion" rule, and at a hearing held just over a month later, the court removed the "no talking about religion" rule but overruled Parents' objections to the other rules. During the short time the "no talking about religion" rule was in place, however, Parents—and Father in particular—pointedly refused to abide by it; indeed, Therapist later testified that Father brought up religion in "nearly every visit."

¶19 For instance, during one session between Father, Felicity, and Chloe, Therapist had to ask Father "seven times" to stop talking about religion. In previous sessions, Therapist had asked Father to focus on "listening" to the girls, because he "spoke so much" during the sessions that the girls typically did not "have the opportunity to share" their feelings. But in this session, and despite Therapist's attempts to intervene, Father continued his behavior of dominating the discussion and refusing to listen to the girls' concerns, explaining that "he had the power from God, that he had the power of the priesthood" and they did not, which gave

him the right to direct all decisions for the family generally and for the girls specifically. At times physically standing up and towering over the girls, he told them that Brother-in-Law had no right to take decision-making power away from Father and that "God gave [Father] the right" to make decisions for the children as he saw fit. The girls reacted by "hiding" and "cover[ing]" themselves with pillows, and "scoot[ing] closer together" in solidarity. They appeared "very defeated" and "stopped talking"; Therapist observed that they "completely withdrew and shut down and were done having any interaction at that point."

¶20 As time went on, and recognizing that no progress could be made as long as Father dominated the discussion during therapy, Therapist attempted to make future sessions more "child-focused." During one session, Chloe and Felicity "started to express" how they often felt bullied by Father, and he responded by stating "that people who get bullied . . . are victims because they allow themselves to be." He told the girls that it was "their fault" that they were being bullied and that he had done "nothing" wrong. In an effort to get through to Father, Therapist then attempted a "role reversal" technique whereby Felicity would portray Father and Father would portray Felicity; the purpose of this exercise was to give Father an "understanding of how his children felt when he lectured them." Once Felicity (pretending to be Father) began her lecture, Father "started fighting back instantly." Therapist informed Father that he was not "doing the role reversal the right way" because, as Father had already explained, "he expects complete compliance" from the children when he lectures. To fully engage with the role-reversal exercise, Therapist instructed Father "to sit there" and "listen" just as he expected his children to do for him. This instruction angered Father, who turned on Therapist, declaring that she should not be "allowing his children to bully him" and that she was "undermin[ing] his parenting skills." He also accused Therapist of "taking away his religious rights" by engaging in this

role reversal, offering his view that Therapist was attempting to indoctrinate the children with her "secular views."

¶21 In another session, Therapist instructed the children to write down the details of some of the different traumas they had experienced. The plan was to then have each child share their thoughts and have Father "meet the child[ren] emotionally" and "validate" their feelings, and then have an opportunity to explain the intention behind his actions. As the children began to explain what they had written, Father interrupted and began to argue and "discredit" what the children were saying. Father, who was now on his feet, tried to take control of the session, reaching out to grab the papers from the children so he could read them and address them in the manner he saw fit. At this point, Felicity asked "for a two-minute break," which Therapist agreed would be a good idea. Watching the children defer to Therapist for permission to leave the room further agitated Father. He began telling Therapist that he was the one "who gets to decide what his children do" and that Therapist does not "get to undermine him and his parental authority." Therapist tried to explain that it was okay to take a brief break, given that things were "getting rough," and she stated that if Felicity needed a break, she should be allowed to have one. Father disagreed, situating himself in the doorway and blocking the exit. Therapist tried to maneuver Felicity around Father while gathering the children's papers, at which point Father began "lunging" at Therapist and trying to snatch the papers out of her hands. Therapist was forced to hold the papers behind her back, telling Father the documents belonged to the children and he was not permitted to take them. Father started yelling that these were "his kids" and he was therefore "entitled" to see whatever they wrote on the papers. He then turned his anger on the children, telling them "it was time for them to be punished and that they need[ed] to have their consequence." At this point, Therapist determined that the session was over, and she began escorting the children to the reception area. Father was following close behind,

continuing his tirade and informing Therapist "what [he was] going to do to [Therapist], what [he was] going to do to the caseworkers, [and] what he's going to do to the kids."[5]

¶22 After that point, the therapists who had been working with the family came to the collective conclusion that group therapy sessions were doing more harm than good. For one thing, the sessions were "unproductive"; Father had "made it very clear, from the beginning, that he didn't think [therapy] was necessary" and that he did not need to be there because "nothing needed to change" and he "wasn't going to make changes." In addition, and perhaps more significantly, the therapists "no longer felt that it was safe to continue having family therapy sessions that included [Father]." In particular, Therapist wrote in a report that, "[t]herapeutically speaking," it would "be detrimental to the children to continue family therapy" because it would only further "damag[e] their relationship[s]." She believed, however, that it was critical that individual therapy still continue.

¶23 Given the tenor of the group therapy sessions, the GAL filed a motion to suspend all visitation—even in a therapeutic setting—between Father and the children. Father objected to this request, and he took the opportunity to advance his own view of the group therapy sessions. In a filing he made with the court, Father opined that the children were "being coached and groomed in an attempt to avoid reunification with" Parents. Father believed he—as religious leader of the family—had a right to review all recordings of the children's individual therapy sessions, and he took issue with Therapist's refusal to provide him any such recordings. Father concluded his filing with a request

---

5. A second therapist also recalled this incident, later testifying that Father became "aggressive" and was yelling at Therapist about DCFS "framing his family" and how there was a "large conspiracy . . . brought on through DCFS" and "the State of Utah."

that a new therapist be appointed, one that would not engage in the "foisting of secular values" upon his family.[6] At a hearing in January 2019, the court ordered that therapeutic visitation with Chloe and Felicity be "discontinued until the issues are adjudicated." But the court also indicated that the children "may visit" with Parents "if approved" by the DCFS caseworker and the GAL and "with input from the children's therapists." The court did not order that any change of therapists take place.

*Mother's Adjudication*

¶24 Mother did not contest the allegations in the State's petition, admitting to some of them and, with regard to the rest, electing to proceed pursuant to rule 34(e) of the Utah Rules of Juvenile Procedure.[7] Based on the uncontested allegations in the

---

6. During later testimony, Father testified about the group therapy sessions and, specifically, about the issues he had with Therapist, and he attempted to explain his perception that Therapist did not have "the same values" as Father. When specifically asked whether he wanted a therapist who was a member of The Church of Jesus Christ of Latter-day Saints (LDS), Father stated that he doesn't "just look at a person on an LDS basis." He explained, instead, that he wanted the children to have a therapist who agreed with him on the "eternal values or principles" that he "believe[d] govern the universe."

7. Mother later asked the court to "set aside" her rule 34(e) plea and requested "that a new trial be ordered to address the allegations" in the State's petition. *See* Utah R. Juv. P. 34(e). The basis for this request was that Mother claimed "she was not certain of what a [r]ule 34(e) proceeding involved and the resulting consequences." The court denied Mother's request, stating that Mother had "affirmatively waived her right to a trial"

(continued…)

petition, the juvenile court found that all four children were neglected as to Mother. The court determined that Chloe, Felicity, and Hannah were neglected because Mother subjected them "to mistreatment or abuse and/or" because they "lack[ed] proper parental care by reason of the fault or habits of [Mother], and/or" because Mother had "failed to provide proper and necessary subsistence, education or medical care when required or any other care necessary for [the] health, safety, morals or well being of the children." The court determined that Noah was neglected because he was "at risk of being neglected or abused because another child in the same home [was] neglected or abused."

¶25    At a dispositional hearing that took place a few weeks later, the juvenile court set reunification as the primary permanency goal, and it ordered that Mother receive reunification services and comply with a child and family plan (Mother's Plan). In particular, the court ordered Mother to "complete a domestic violence assessment," complete an "in home peer parenting" program, undergo a "neuro-psychological evaluation," and "complete individual therapy."

### Father's Adjudication

¶26    Father, on the other hand, elected to contest the allegations in the State's petition, and the matter proceeded toward an adjudication trial, which was held over five trial days in March and April 2019. During the first day of trial, Father was represented by counsel, but he then requested that the court

---

and that the court had "confirmed that she understood she was waiving her right to trial." The court had even gone a step further and "had a colloquy specifically with [Mother] and her counsel wherein she indicated she understood" the implications of proceeding under rule 34(e) "and the resulting findings that would be made as a result of that course of action."

"replace his second appointed attorney"—Father had already switched appointed counsel once—which request the court denied. Father then elected to represent himself for the remainder of the trial, although the court determined that Father's second appointed attorney should "continue as standby counsel." During the trial, the court heard testimony from the four minor children, Branch President, several DCFS caseworkers, Oldest Sister, Brother-in-Law, and Father.

¶27 Following the trial, the court took the matter under advisement, and it issued a written decision in June 2019. In its conclusion, the court determined that all four minor children had "been emotionally abused" in a "continuing pattern of emotional maltreatment" by Father and that this "ongoing abusive environment has emotionally damaged the children." The court's findings, made in support of this determination, are remarkable and are worth describing in some detail.

¶28 The court found, by clear and convincing evidence, that the allegations contained in the State's petition were generally correct. It found that, in May 2018, Chloe wrote an "alarming letter" to her teacher describing "her home environment" and expressing "her desire to kill herself on a constant basis." The home environment in question was one dominated and directed by Father, who—in an ostensible attempt to "promot[e] the necessity and value of work and chores"—was "unhealthily" using these principles "to control and subjugate the children." He assigned "continuous chores" to the children and demanded that each task be performed timely—often using the mantra "housework before homework"—and perfectly, assigning additional chores and requiring the children to stay home from school if chores were not performed to his satisfaction. And he required the children to pay him for even basic household privileges, like eating "fresh food" (as opposed to "expired food stores"), using the computer, and getting rides to school.

¶29 The court found that Father often used physical force—or the threat of it—to control Mother and the children. On one occasion, Father roughly "grabbed the car keys" from Mother's hand, "which resulted in a cut on [Mother's] hand." On another occasion, Father "threw the family dog out the back door because the children would not kneel down for family prayer." Once when Noah apparently did not kneel down fast enough for family prayer, Father threw "a headlamp" at him. Other times, Father "grabbed" the children "by the wrists to make them do something." Father once "brought [Noah] to his feet by . . . grabbing the back of his hair," and another time he "slapped [Hannah] on the mouth."

¶30 The court found that Chloe was not the only one of the children experiencing suicidal ideations: it found that, "as a result of the continuing emotional trauma, [Felicity] felt trapped and became suicidal; she thought about dying as a way to escape the home." Parents were not receptive or attentive to Chloe and Felicity in this regard; although Mother did take Chloe to one appointment for a mental health assessment, there was no follow-up or any actual treatment rendered and her "suicidal thoughts were not properly addressed." Indeed, the children were told not to speak to anyone—including church leaders and DCFS officials—about the conditions in the home, and they were threatened with punishment if they did. Felicity was even told, by one of the Parents, that "if [Chloe] were to commit suicide, it would be her fault."

¶31 The court also found credible Branch President's account of his meeting with the girls in August 2018, and found that the meeting occurred as set forth in Branch President's letter to DCFS (as described above). And it found that DCFS had acted appropriately by seeking a warrant for removal in August 2018.

¶32 The court then examined the statutory definition of "emotional abuse," as well as Utah case law interpreting that definition. The court specifically noted that a finding of "abuse" requires a finding of "harm," which—as applied to emotional abuse—requires a finding that a child has suffered "a serious impairment in the child's growth, development, behavior, or psychological functioning." With this standard in mind, the court concluded that all four children had been "emotionally abused by" Father and that, in addition, Chloe was also "a neglected child due to the lack of proper parental care" from Father. The court found that the threats Father constantly made to the children had "caused emotional upheaval" in their lives "and negatively impacted [their] development." And the court found "a continuing pattern of emotional maltreatment of the children which [had] resulted in two of the children considering suicide as an option to end the maltreatment," and it found that "these suicidal ideations and thoughts demonstrate a serious impairment to" the affected children's "psychological functioning." In particular, the court found that Father,

> [t]hrough the use of chores, yelling, physical control, the use of access to food, the harm to a family pet, insulting comments, blaming and payment for basic things, and the daily arguing and sometime[s] physically aggressive behavior between . . . [P]arents that the children witness, . . . has created a hostile environment, which is manifested in the children feeling unsafe and being terrified of being at home with [P]arents.

The court concluded by noting that "this ongoing abusive environment has emotionally damaged the children." While the court did not find "physical abuse as defined" by Utah law, it did conclude that "the children's testimony was credible about the use of physical force to submit to the requests of [Father]." The

court concluded that these "physical actions" on Father's part "were part of" the "emotionally abusive parenting style" that he "used to intimidate and control the children."

¶33 Father appealed the court's adjudication order, but he raised only one argument—a procedural one—in his appellate petition. Specifically, he asserted that "the juvenile court lacked jurisdiction to enter the [adjudication] order because the adjudication trial was not held within sixty days after the shelter hearing," which Father asserted was required by Utah law. Father mounted no appellate challenge to the substance of the court's adjudication order. In an unpublished order, we rejected Father's procedural argument and affirmed the adjudication order, concluding that Father had not preserved his procedural argument in the juvenile court and that Father could not demonstrate plain error.

¶34 Soon after the juvenile court issued its adjudication ruling, it held a dispositional hearing regarding Father. At the conclusion of that hearing, the court set a primary permanency goal of reunification and ordered that Father receive reunification services. The court also ordered that Father "comply with all of the provisions of" a child and family plan (Father's Plan). Among other things, Father's Plan required Father to obtain a mental health evaluation, follow any and all recommendations made by the evaluator, and participate in therapy.

*The Permanency Hearing*

¶35 A few months after entering its adjudication order regarding Father, the court held a permanency hearing, which took place over three trial days in September and October 2019. Again, the court heard testimony from members of the family as well as from therapists, DCFS caseworkers, and others. At the conclusion of the hearing, the court found, as to both Parents, that

DCFS had made "reasonable efforts" to facilitate Parents' compliance with their plans and to facilitate reunification.

¶36 With regard to Mother, the court found that she had made some positive efforts to comply with Mother's Plan. In particular, Mother had "participated in visits with the children," "obtained a psychological evaluation and engaged in therapy," and completed an "assessment for domestic violence." But the court also noted that Mother "continues to not give any credence to the children's testimony about the conditions and treatment within the home" and, because of this belief, "no progress has been accomplished in family therapy." As part of Mother's Plan, Mother had also been instructed "to provide a safe and stable home." The court found that Mother was not "capable or willing to do this given the continued denial of any concerns of emotional abuse of the children with her or [Father]." Thus, even though Mother had made some progress "on a number of the services ordered," the court concluded that she had made insufficient progress "in the most essential areas of family therapy and personal insight to have the children safely returned home at this time or in the next 90 days." For those reasons, the court terminated reunification services for Mother.

¶37 With regard to Father, the juvenile court found that he had "not substantially complied with" Father's Plan. First of all, Father had refused "to obtain a mental health evaluation," despite the fact that DCFS caseworkers had set up appointments for Father to receive the evaluation and had "encourage[d] him to complete" it "prior to the permanency hearing as it would show his efforts in the reunification process." In addition, the court found that Father had failed to "participate in meaningful family therapy." And most significantly, it found that Father had failed in his overarching task of providing "an emotionally safe or stable home to which the children may be returned." The court specifically noted that Father, through his testimony at the hearing, had

shown that there had "been no change in his perception of the facts which facilitated the [S]tate's involvement." Accordingly, the court terminated reunification services for Father and set adoption as the new "primary permanency goal" for the children, with a secondary goal of permanent custody and guardianship with Oldest Sister.

*The Termination Trial*

¶38 In October 2019, soon after the permanency hearing, the State filed a petition to terminate Parents' parental rights regarding all four minor children. But due to a series of delays—caused by numerous factors, including motions to disqualify the judge, attempts to appeal certain orders, requests by both Parents for new counsel, disputes over discovery and subpoenas, and (most significantly) the emergence of the COVID-19 pandemic—the termination trial did not begin until July 2021. And the trial, once it began, was quite lengthy, spanning parts of nineteen trial days and involving the testimony of more than twenty different witnesses. Due to scheduling and pandemic-related concerns, the juvenile court was unable to hold the trial in one large block of time; instead, the trial occurred on scattered dates over the course of eleven months. In the meantime, both Chloe and Felicity turned eighteen and became adults, and they each chose to be adopted—as adults and in separate district court proceedings—by Oldest Sister and Brother-in-Law. By the time the termination trial ended, only Hannah and Noah were still minors and still within the jurisdiction of the juvenile court.

¶39 First to testify at trial were three DCFS caseworkers, who told the court that it had been difficult working with Parents, especially Father. One testified that whenever difficult subjects arose, Father would become "visibly upset," raise his voice, and stand very close to her and wave his finger. Mother was less confrontational, but the caseworkers reported that the children

felt that they could not be entirely honest with Mother "because they felt that she was just collecting information to use against them" and "that she was taking notes to provide to [Father]." At one point, one of the caseworkers had advised Mother that it would be "unlikely" that her reunification with the children would be successful "if [Mother] and [Father] were still together" and if Father continued to refuse to engage in services.

¶40 The court also heard about an incident in October 2019 when Father and a caseworker had gone with Chloe to visit a child psychiatrist (Psychiatrist) to discuss Chloe's suicidal ideations. Psychiatrist testified that Father made it clear from the beginning that he was against the appointment because he believed there was "nothing wrong" with Chloe and that she "did not need medication." Father became "confrontational" with Psychiatrist, in terms of both his "voice tone" and his "physical posturing," and demanded to see a copy of Psychiatrist's credentials. Father acted similarly toward Psychiatrist's office staff. Psychiatrist found Father's behavior so remarkably inappropriate that he wrote a letter to the court—the first time Psychiatrist had done so in decades of practice—asking that Father be kept away from his office and prohibited from contacting his employees regarding Chloe's medical care.

¶41 Mother's therapist testified that Mother felt that DCFS became involved only because the children had made up "a bunch of lies" just so they could have "an easier life." Mother also had a habit, similar to Father's, of raising her voice and shaking her finger at the therapist and would accuse her "of being involved" in "the efforts" to keep the children "away from [Mother]." The therapist met with Mother seventeen times, but she indicated that, "at the point of discharge," Mother had made "little progress."

¶42 The court also heard testimony—from DCFS caseworkers as well as from the psychologist tasked to perform the

assessment—that Father refused to undergo a mental health evaluation, as ordered by the court pursuant to Father's Plan. Father's stated concern was that he did not want DCFS to have a copy of the psychologist's eventual report, apparently because he believed that DCFS was "kind of out to get him"; the psychologist explained to Father that he had been retained by DCFS and therefore DCFS was going to get a copy of the report. The psychologist testified that he had completed more than 4,000 assessments for DCFS over several decades and that this was the first time anyone had refused to participate on the ground that they did not want DCFS to receive a copy of the report.

¶43　Mother, on the other hand, did participate in a mental health evaluation; the psychologist who performed her evaluation testified that Mother had dependent personality disorder, obsessive-compulsive personality disorder, and dementia. The psychologist went on to note that she could not rule out aphasia as another possible diagnosis but, to be certain, Mother would need to undergo an evaluation with someone more qualified in speech and language. According to this psychologist, someone in Mother's position would likely struggle with daily life and would need "a lot of assistance and accommodations."

¶44　Oldest Sister testified, and she offered her perspective on what it had been like to live with Parents; in addition, she told the court about one incident that took place after she had moved out. She recounted how she would sometimes return to Parents' house to visit her siblings, and on one such occasion, Father struck Oldest Sister. The incident began with Father demanding that, while Oldest Sister was visiting, she "clean the house" for Parents. Oldest Sister decided to stand up to Father and tell him that she was happy to help around the house while she was visiting but that she was not there to be Father's "maid." At this, Father "backhanded" Oldest Sister, knocking her to the floor. While on the floor, Oldest Sister threatened to call the police, at which point

Mother "jumped on top" of her, warning her not to call law enforcement and that if she did, it would "ruin" the family.

¶45    Oldest Sister also offered her account of the circumstances that caused DCFS to become involved in this case, and she described that she has a strong bond of love and affection for her siblings and that they are thriving in her care. She noted that she and Brother-in-Law have three children of their own, and she stated that her four siblings have integrated well with her three children. She also testified that her siblings "know that we love them no matter what" and that they are no longer "afraid." She told the court that she was ready and willing to adopt all four of her siblings—she had not yet adopted Chloe and Felicity—even if it meant that her own relationship with Parents would suffer.

¶46    The court also heard testimony from all four minor children, which testimony we describe here in some detail.

¶47    **Chloe's Testimony**: Chloe testified over two trial days in July and August 2021, just before she turned nineteen and was about to leave on a religious mission. Chloe described herself as a religious person, and she noted her appreciation to Parents for teaching her religious principles. But she expressed disagreement with the manner in which Father often exercised his authority within the family, offering her view that Father would "force" religion "down [the children's] throats" and "use it against" them, which Chloe believed "was tearing [the family] apart." She stated that it had been the children's idea to prohibit Father from talking about religion during group therapy sessions. At home, Chloe had never felt like she could express herself or "say anything," because Father always had to be "in control" and it was always "his way or the highway." She described how the children were "scared" of Father and would sometimes hide in a closet, "all huddled up together," because they were "terrified." Chloe

described instances where she had witnessed Father physically hurting members of the family. On one occasion, shortly before Older Brother had moved out, she saw Older Brother arguing with Father when Father "grabbed" Older Brother and "put him in a choke hold." When Older Brother broke free of Father's grasp, Chloe witnessed Father "push[ing] him down the stairs." She confirmed that she had been "suicidal when [she] was in [Parents'] house." When she told Father about it, his response was, "If you commit suicide, you're going to go to hell." She also confirmed that Father had interfered with a medical appointment in which she was attempting to see Psychiatrist to discuss medication and treatment. And she described how Father would make the children eat expired food, even sometimes when it had "mold on it" or when "the expiration date [was] . . . more than two or three or sometimes even five years past."

¶48 In addition, Chloe offered her view that Father had not "done the things the [c]ourt asked him to do" in order to reunify with his children, and she stated that she did not think she could have meaningful contact with Father going forward. She viewed Father's unwillingness to engage with reunification services as a sign that he "didn't want us," because if Father had wanted them, he "would have gone through the process" that the court set out instead of "fighting so hard to be like 'I'm right and you're not going to tell me what I can and cannot do'" regarding the children.

¶49 Chloe was more equivocal about Mother, stating that she believed she could potentially have a good relationship with Mother if Mother were no longer with Father, and that she and Felicity had expressed that sentiment to Mother at one point. In Chloe's view, Mother acted merely as Father's "puppet" and did not feel free to offer "her true feelings." Mother reacted negatively to the girls' suggestion that she should leave Father, telling Chloe, "[D]on't you dare ever make me choose."

¶50   Chloe acknowledged that, as an adult, she had chosen to be adopted by Oldest Sister and Brother-in-Law, and she stated that she had wanted that outcome all along, even when she had been a minor, and that she had chosen adoption because she wanted "a loving and supportive" place "to call home" and didn't feel like she ever had that with Parents. She noted that there had been challenges, initially, transitioning from "sister to daughter overnight" in relation to Oldest Sister, but she described her life with Oldest Sister and Brother-in-Law as, on balance, "pretty freaking amazing."

¶51   **Felicity's Testimony**: Felicity testified in November 2021, about a month before she turned eighteen. She stated that her home with Parents was "really scary" and not "safe." Parents "yelled all the time," fed the children "expired" food unless they paid Father for fresh food, and made the children do endless chores that somehow could never be "done good enough." She recalled one occasion in which Father kept her up until 2:00 a.m. on a school night because he thought she hadn't cleaned the kitchen counters well enough; Felicity finally went to bed, but Father came into her room "and poured water over [her] head" to wake her up and made her "go finish" cleaning the counters. And she recalled another occasion in which Father threw her dog outside because she "didn't kneel down for prayers fast enough."

¶52   Felicity confirmed that, while she lived with Parents, she struggled with "anxiety and depression" and "thought about killing [her]self." She perceived Parents as being unsupportive of her during this time; Mother in particular was resistant to helping Felicity obtain medication for her depression, telling her instead to just "read the scriptures."

¶53   Since being placed with Oldest Sister and Brother-in-Law, Felicity has had visits with Parents, but she testified that she doesn't like the visits. During the visits, Parents would "act like

. . . everything's fine" and would refuse to engage with the problems in the home. She stated that the visits with Father, in particular, didn't go well. On one occasion, she asked to take a break while Father was talking to her, and Father became angry, telling her she was not allowed to leave the room while he was addressing her. After that visit, she and the caseworkers came up with a kind of "safe word" for her to use if she needed a break during a visit: she was to say that she needed to use the restroom.

¶54   She confirmed that group therapy with Parents had not been productive because Parents "would just deny" everything and would "refuse to say that they did something wrong." She offered her perception that Parents, during the reunification period, "haven't done anything to change."

¶55   Finally, Felicity testified that she liked living with Oldest Sister and Brother-in-Law because "they're kind and they care about" her and she feels like she is "actually loved." She testified that she does not "want to have a relationship with" either one of her Parents and that she wanted to be adopted by Oldest Sister and Brother-in-Law. Indeed, in March 2022—before the trial ended but after she testified and after she turned eighteen—she elected to be adopted by Oldest Sister and Brother-in-Law.

¶56   **Hannah's Testimony**: Hannah testified in September 2021, when she was fifteen. She confirmed that she and her siblings had been removed from Parents' home because "it wasn't really safe" there. She testified that there was "a lot of contention" in the home and that there was "so much screaming and yelling" that she and Noah would sometimes "go hide in a closet" because they were "really scared." She discussed several incidents in which Father used physical force, once on Mother—when he forcibly "grabbed the keys" out of her hand—and sometimes on the children: she described Father throwing a "headlamp" at Noah and once "slapp[ing] her across the face." Often, the yelling was about the

children's chores and involved Parents indicating that they were dissatisfied with the manner in which the children had performed their tasks. She said that "every time" Parents started yelling, she "was afraid they were going to hit" her, which caused her "anxiety" and was "really scary." She testified that, in those situations, she "couldn't talk back" because, if she did, she would "get in more trouble."

¶57     She testified that the post-removal visits were "pretty scary at first" because she worried that Parents "were going to take all of their anger" about the removal "out on" the children. Hannah did not believe that the visits were productive, and she testified that she felt "released" and "happy" when visits with Father were "canceled." She believed that the group therapy sessions, in particular, were unhelpful, largely because Parents refused to ever acknowledge that they might have done anything wrong.

¶58     And she testified that living with Oldest Sister and Brother-in-Law was "pretty awesome" because she feels "loved there" and feels "like someone cares for" her and that she wasn't "scared anymore." She told the court that she wanted to be adopted by Oldest Sister and Brother-in-Law, and that she would "run away" if she were forced to return to Parents' home.

¶59     **Noah's Testimony**: Noah testified in September 2021, a few weeks before his thirteenth birthday. He also testified that Parents' home "wasn't a safe environment" due to the constant "yelling and contention," offering his view that "there was almost never . . . peace and happiness." He recalled Parents waking him up by spraying him "with a water bottle," and he recalled the headlamp incident.

¶60     His view of the post-removal visits was that he "didn't really want to have them" because he didn't "want to have a relationship with [Parents] anymore." He found the visits "odd at first" but then, after a while, he just found them "boring" and "a

waste of time" because Parents would just ask "the same questions." He also believed that Parents "wouldn't try and improve" themselves through the visits and group therapy.

¶61 And Noah testified that he "really like[s]" living with Oldest Sister and Brother-in-Law and that he wants to "live permanently" with them. He testified that Oldest Sister's home is "a loving environment" where they "help each other . . . try to get better and improve." He stated that he doesn't "want [Parents] to be [his] parents," and that he would not "feel safe" if he was returned to Parents' custody. He expressed a desire "to have [Oldest Sister and Brother-in-Law] be [his] parents."

¶62 Finally, the court heard extensive testimony from Parents. Father testified over three trial days and was the only witness to testify on two of those days. Mother also testified over three trial days. For the most part, in the interest of brevity, we present their testimony through our description of the juvenile court's ruling, set forth immediately below. But in general, Parents refused to acknowledge that they had acted in any way inappropriately, and they defended their behavior as a means of instilling discipline and religious-based values in their children.

*The Court's Post-Trial Ruling*

¶63 Following the presentation of evidence, the attorneys presented their closing arguments over parts of two days. After that, the juvenile court took the matter under advisement and, a few weeks later, issued a fifty-three-page written decision. In that decision, the court summarized the testimony that had been presented; in particular, the court spent some twelve pages summarizing Parents' lengthy testimony.

¶64 The court noted that Father described Oldest Sister as "spoiled" and described Chloe's expression of suicidal ideations as "play[ing] the suicide card." Father acknowledged that he had

awakened the children with water, thrown a headlamp at Noah, and "raised his voice" during the meeting with Branch President. But he justified these behaviors as merely strict religious-based parenting. The court noted Father's stated belief that "the [State] had invaded his family" and was "taking over his stewardship," as well as Father's contention that the assigned therapists "had replaced his religious beliefs" by instituting rules for the therapy sessions with which he disagreed. And the court noted Father's testimony that Branch President was "highly judgmental and lacking in integrity," as well as Father's stated belief that DCFS, Branch President, and Oldest Sister "got together with malice to engage in child kidnapping and child trafficking" so that Oldest Sister could "enslave[]" the children to "serve [her] family."

¶65 With regard to Mother, the court noted that she had been married to Father for thirty-five years and "intends to stay married to him." Mother testified that, at one point, the GAL and DCFS caseworkers told her that "she had to choose between [Father] and the children," and that she "told them no, that they are not going to break up the family." The court noted Mother's belief that she had attempted to comply with Mother's Plan, and that Mother "wants to have a special relationship with all of her children and would like the family to be together."

¶66 After summarizing the voluminous testimony presented at trial, the court made certain findings and conclusions. It found that Father "uses religious, familial, and authoritative vocabulary to intimidate the children," and that he "has used his physical presence" in that manner as well "by standing up, making his body larger, [and] power posing [to] the children." The court found that Father "has not engaged in purposeful family therapy with the children to address the issues" in the case and that Father "has never acknowledged that he" might bear some responsibility for the situation. The court noted that the "family never moved from square one in talking about the real

issues that led [Chloe] to be suicidal and had [Noah] and [Hannah] hiding in the closet." The court declared that, "[w]ithout addressing and correcting the problems in the home as to parenting style and the environment, the children and [Father] will never have a healthy relationship." The court found that "there does not exist a bond of love and affection between the children and [Father]." And it observed that Father certainly "has the constitutional right to parent his children" but that the "children also have the right to be free from emotional abuse." In summary, the court found that Father "is an unfit parent" and that Hannah and Noah could not "safely be returned to [Parents'] home to reside with [Father] since he has made no efforts," or "only token efforts," to address and eliminate "the issues of emotional abuse which exist in the home."

¶67    As to Mother, the court found that she "supported [Father] in his harmful treatment of the children as he tried to control their lives," and that she "minimized the emotional maltreatment that was occurring in the home and the extent of the emotional trauma" the children experienced. It found that Mother "continues to deny . . . any emotional . . . maltreatment of the children," that she "laughs when questioned about these things and continues to blame the children and [Oldest Sister] for [DCFS's] intervention," and that she "has never considered for a moment that she or [Father] have done anything untoward or harmful to the children." The court found that Mother's "continued association with [Father] puts the children at risk should they be returned to her custody and care." The court found grounds sufficient to justify termination of her parental rights, concluding that Mother was "unable or unwilling to remedy the circumstances that caused the children to be in an out-of-home placement" and that she had made only "token efforts to eliminate the risk of serious harm to the children."

¶68    Having found grounds sufficient to justify termination of Parents' rights, the court then turned to the best-interest question. The court determined "that it is in the children's best interest and strictly necessary to terminate" Father's parental rights. The court considered whether to impose a permanent custody and guardianship arrangement with Oldest Sister and Brother-in-Law, but it did "not find this alternative to be in the children's best interest." The court noted that both Branch President and Psychiatrist had considered Father so aberrant that—in an effort to keep Father away from the children—they had each taken action they had never taken before. And the court noted that, "if permanent custody and guardianship were granted" to Oldest Sister, Father "would still be in the orbit of the two remaining [minor] children" and would be able to "assert[] his will as to basic medical and otherwise personal decisions in the care of the children." For these reasons, the court concluded that the State had demonstrated, by clear and convincing evidence, that termination of Father's rights was strictly necessary to advance the children's best interest. The court therefore ordered that Father's rights be terminated.

¶69    As to Mother, however, the court reached a different conclusion. The court first noted "the legislatively mandated position that wherever possible family life should be strengthened and preserved," and it observed that the children were in the custody of a relative—Oldest Sister—and were not "in a home unrelated to" Parents. The court noted that the children's visits with Mother had gone better than their visits with Father, and that their relationship with Mother—unlike their relationship with Father—does not cause "the children emotional or mental harm." Accordingly, the court concluded that, with regard to Mother, "the children can be equally protected and benefited by an option other than termination." The court therefore declined to terminate Mother's rights, and it placed the children in a

permanent custody and guardianship arrangement with Oldest Sister and Brother-in-Law.

*The GAL's Rule 59 Motion*

¶70   Shortly after the issuance of the court's initial post-trial ruling, the GAL filed a motion—grounded in rule 59 of the Utah Rules of Civil Procedure—requesting that the court reconsider its decision not to terminate Mother's parental rights. The GAL asserted that, in making its decision not to terminate Mother's rights, the court had viewed matters too much from Mother's point of view and not enough from the children's point of view. Mother opposed the motion.

¶71   During a hearing on the motion, the GAL began to discuss events that had occurred since the conclusion of the termination trial, and Mother's counsel objected. The court determined that it would permit counsel to "put in a memorandum or affidavit" the "additional information supporting" its argument, and it would then allow all other parties "to file an affidavit or other response." Following the hearing, the GAL filed with the court an affidavit from Brother-in-Law in which he described, among other things, the effects that post-trial visits with Mother had been having on Hannah and Noah.

¶72   A few weeks later, the juvenile court issued a written ruling granting the GAL's motion. In the introductory paragraph of that ruling, the court noted that, in preparing to make its decision, it had reviewed "the filings and arguments of the parties, the oral argument on the [m]otion and the prior testimony from the termination trial and the original findings and order." But the court made no specific mention, anywhere in its ruling, of the post-trial events described in Brother-in-Law's latest affidavit. Instead, the court stated that it was reconsidering its prior ruling and, this time, it was ordering termination of Mother's parental rights; it explained that, in its initial ruling, it had "failed to give

the proper weight to the children's expressed wishes to be adopted" by Oldest Sister and Brother-in-Law. The court noted that the "children have been direct in seeking to be adopted." And it noted that it was statutorily commanded to "give the minor's wishes added weight" if the minor in question was fourteen years old or older, a stipulation that, in the court's view, applied to all of the children (Noah having recently turned fourteen). After reconsidering its prior decision in light of the added weight given to the children's stated wishes, the court determined that termination of Mother's rights was in the children's best interest, and it therefore ordered that her rights be terminated.

ISSUES AND STANDARDS OF REVIEW

¶73     Parents now appeal, and they raise several issues for our review. First, they contend that the juvenile court violated their constitutional rights. "Constitutional issues, including questions regarding due process, are questions of law," and the conclusions of the juvenile court on such issues are reviewed "for correctness." *In re adoption of K.T.B.*, 2020 UT 51, ¶ 15, 472 P.3d 843 (quotation simplified). Along with this argument, Parents also assert that the constitutional issues they raise indicate that the court erred in concluding that DCFS made reasonable efforts to facilitate reunification. To the extent that Parents' constitutional arguments raise "reasonable efforts" questions, we review the court's ruling more deferentially. *See In re P.J.R.*, 2023 UT App 27, ¶ 24, 527 P.3d 1114 ("A court's determination that DCFS made reasonable efforts to provide reunification services involves an application of statutory law to the facts that presents a mixed question of fact and law, requiring review of the juvenile court's factual findings for clear error and its conclusions of law for correctness, affording the court some discretion in applying the law to the facts." (quotation simplified)), *cert. denied*, 534 P.3d 750 (Utah 2023).

¶74    Second, Parents assert that their respective attorneys provided ineffective assistance of counsel at various points throughout the litigation. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *In re D.G.*, 2022 UT App 128, ¶ 6, 522 P.3d 39 (quotation simplified), *cert. denied*, 527 P.3d 1106 (Utah 2023).

¶75    Third, Father argues that some of the juvenile court's factual findings were against the clear weight of the evidence. "In order to overturn the juvenile court's decision the result must be against the clear weight of the evidence or leave [this] court with a firm and definite conviction that a mistake has been made." *In re G.D.*, 2021 UT 19, ¶ 70, 491 P.3d 867 (quotation simplified).

¶76    Finally, while Parents do not take issue with the juvenile court's ruling that statutory grounds for termination existed, Parents do challenge the court's ruling that termination was strictly necessary to promote the children's best interest. We review a trial court's "best interest determination deferentially, and we will overturn it only if [the court] either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence." *In re D.S.*, 2023 UT App 98, ¶ 15, 535 P.3d 843 (quotation simplified), *cert. granted*, Jan. 25, 2024 (No. 20230877). But "because the evidentiary standard applicable in termination of parental rights cases is the clear and convincing evidence standard, we will assess whether the juvenile court's determination that the clear and convincing standard had been met goes against the clear weight of the evidence." *Id.* (quotation simplified).

¶77    Along with her best-interest argument, Mother raises an additional issue: she asserts that the juvenile court erred by allowing the GAL to submit new evidence of post-trial matters in support of the rule 59 motion. "We generally disturb a trial court's grant or denial of a rule 59 motion only if it constitutes an abuse

of discretion." *Bergmann v. Bergmann*, 2018 UT App 130, ¶ 12, 428 P.3d 89 (quotation simplified). And we will not reverse that decision if the only errors in it were harmless. *See State v. Loose*, 2000 UT 11, ¶ 10 n.1, 994 P.2d 1237 ("We do not reverse a trial court for committing harmless error."); *Proctor v. Costco Wholesale Corp.*, 2013 UT App 226, ¶ 9, 311 P.3d 564 ("[A] harmless error does not require reversal."), *cert. denied*, 320 P.3d 676 (Utah 2014).

ANALYSIS

I. Constitutional Claims

¶78 We first address Parents' assertion that the "juvenile court process" that resulted in the termination of their parental rights violated their constitutional rights. We describe Parents' specific claims in more detail below, but before we discuss the particulars of those claims, we pause to emphasize two critical background points, one legal and one factual, that help frame our analysis.

¶79 The legal background point is straightforward and should go without saying: a parent has no general right, whether statutory or constitutional, to abuse or neglect a child for religious reasons.

¶80 Utah's child welfare statutes regarding abuse of a child have no exceptions allowing abuse to occur on religious grounds. In the child welfare context, "[a]buse" means (among other things) "nonaccidental harm of a child" or "threatened harm of a child." Utah Code § 80-1-102(1)(a). The governing statute specifies that "reasonable discipline" of a child does not constitute "[a]buse," nor does "reasonable and necessary physical restraint or force" applied in defense from or protection of the child or others. *Id.* § 80-1-102(1)(b). But there is no statutory exception excusing abuse simply because it might be religiously motivated.

¶81 Similarly, in the child welfare context, "[n]eglect" includes "action or inaction causing . . . lack of proper parental care of a child by reason of the fault or habits of the parent," and includes "action or inaction causing . . . failure or refusal of a parent . . . to provide proper or necessary subsistence or medical care, or any other care necessary for the child's health, safety, morals, or well-being." *Id.* § 80-1-102(58)(a)(ii), (iii). The statutory definition of neglect does include one religious-based exception: a parent who is "legitimately practicing religious beliefs and who, for that reason, does not provide specified medical treatment for a child" has not neglected that child. *Id.* § 80-1-102(58)(b)(i).[8] But other than this narrow exception, Utah's statutes offer no room for a parent, on religious grounds, to take actions that would otherwise constitute neglect of a child.

¶82 Nor is there any constitutional right to abuse or neglect a child in the name of religion. To be sure, parents have a right to teach their children religious principles and to encourage them to comply with the tenets of a chosen religion. *Kingston v. Kingston*, 2022 UT 43, ¶ 24, 532 P.3d 958 (stating that "parents have a fundamental right" under the United States Constitution "to encourage their children in the practice of religion"). But such rights peter out where a parent's religious practices result in mistreatment of a child. *See Zummo v. Zummo*, 574 A.2d 1130, 1154–55 (Pa. Super. Ct. 1990) (noting that parents are "free to provide religious exposure and instruction" to their child as they see fit, "unless the challenged beliefs or conduct of the parent are demonstrated to present a substantial threat of present or future, physical or emotional harm to the child" (quoted in *Kingston*, 2022

---

8. At the adjudication stage, Mother—the parent who was found to have neglected (as opposed to abused) the children—did not attempt to invoke this religious-based statutory exception. Nor does she invoke it here on appeal. Accordingly, as far as we are aware, this exception is not at issue in this case.

UT 43, ¶ 67)); *see also Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944) (stating that "the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare," including in "matters of conscience and religious conviction," and noting that the state's "authority" in this regard "is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience"); *Koch v. Koch*, 207 So. 3d 914, 915 (Fla. Dist. Ct. App. 2016) (noting courts' ability to restrict a parent's rights where there is "a clear, affirmative showing that the [parent's] religious activities . . . will be harmful to the child" (quotation simplified)); *In re Edward C.*, 178 Cal. Rptr. 694, 699 (Cal. Ct. App. 1981) ("Mistreatment of a child . . . is not privileged because it is imposed in the guise of freedom of religious expression."); Amos N. Guiora, *Protecting the Unprotected: Religious Extremism and Child Endangerment*, 12 J.L. & Fam. Stud. 391, 405 (2010) ("Religious belief and conduct cannot be used as justification for placing children at risk; government, law enforcement and the general public cannot allow religion to hide behind a cloak of 'religious immunity.'").

¶83   Next, the factual background point is simply this: as discussed above, Parents have already been adjudicated to have abused or neglected the children, and those adjudications were not substantively challenged on appeal.

¶84   With regard to Father, the juvenile court found—after a five-day adjudication hearing—that Father had "emotionally abused" all four children. The court specifically discussed the rather stringent statutory definition of "emotional abuse" and recognized that it required a finding that a child has suffered "a serious impairment in the child's growth, development, behavior, or psychological functioning." *See* Utah Code § 80-1-102(37)(b). But the court comfortably made such findings with regard to Father, concluding that Father had engaged in "a continuing pattern of emotional maltreatment of the children which has

resulted in two of the children considering suicide as an option to end the maltreatment." The court also found that Father had "created a hostile environment" for the children that caused them to suffer "emotional damage[]," and it found that Father's "use of physical force" was part of the "abusive parenting style" that he "used to intimidate and control the children."

¶85   With regard to Mother, the court determined—based on Mother's own rule 34(e) admissions—that all four children were neglected. In particular, the court concluded that Chloe, Felicity, and Hannah were neglected because Mother subjected them "to mistreatment or abuse and/or" because they "lack[ed] proper parental care by reason of the fault or habits of [Mother], and/or" because Mother had "failed to provide proper and necessary subsistence, education or medical care when required or any other care necessary for health, safety, morals or well being of the children." And the court found that Noah was neglected as to Mother since he was "at risk of being neglected or abused because another child in the same home is neglected or abused."

¶86   Mother did not appeal the court's adjudication order. Father did, but he raised only one argument—a procedural one—in his appellate petition; he mounted no appellate challenge to the substance of the court's adjudication order. In an unpublished decision, we rejected Father's procedural argument and affirmed his adjudication order.

¶87   Thus, Parents have been adjudicated to have abused or neglected the children, and those adjudications were either not appealed or were affirmed on appeal. In light of these facts, Father's attorney agreed, at oral argument before this court, that the adjudication order is now part of the case and that we, for purposes of this appeal, must therefore take it "as it is." As we understand it, this concession is in keeping with Utah law. An adjudication order is "final for purposes of appeal," *see In re*

*S.A.K.*, 2003 UT App 87, ¶ 13, 67 P.3d 1037, and "where a final ruling or order of the trial court goes unchallenged by appeal, such becomes the law of the case, and is not thereafter subject to later challenge," *see SRB Inv. Co. v. Spencer*, 2023 UT App 120, ¶ 29, 538 P.3d 231 (quotation simplified). We have, on several occasions, refused to allow parents to re-litigate adjudication orders in the context of appeals from later orders. *See In re D.G.*, 2014 UT App 22, ¶ 5, 319 P.3d 768 (stating that "matters relating to the adjudication hearing are barred" from consideration on appeal from a termination order where the parent "did not appeal the adjudication order"); *see also In re E.T.*, 2014 UT App 206, ¶ 2, 335 P.3d 394 (per curiam) (stating that where a parent "failed to timely appeal [an] adjudication order, we lack jurisdiction to consider an appeal of that order" in an appeal from a later order).

¶88 Given these background principles and facts, Parents cannot—and here make no serious attempt to[9]—argue that the adjudication findings should be reversed, or that their underlying abuse and neglect should be excused on religious grounds. Instead, they make narrower constitutional arguments.

---

9. As noted, Parents do not challenge the determination that statutory grounds for termination of their parental rights were present in this case. But Parents do assert, in their briefs, that the State interfered with their "right to make value-based decisions regarding the upbringing" of the children. This argument is not independently developed, and—especially in light of Father's attorney's concession at oral argument—we do not interpret it as a frontal attack on the juvenile court's adjudication findings. However, to the extent it is intended as such, we reject that challenge not only because it is inadequately briefed but also because any challenge to the adjudication findings needed to have been made in an appeal from the adjudication order. *See In re D.G.*, 2014 UT App 22, ¶ 5, 319 P.3d 768.

¶89 They begin by asserting, in general terms, that the "juvenile court process" that led to the termination of their parental rights violated their constitutional rights to parent their children and, in particular, their right to encourage their children in the practice of religion. They then point out—citing *Kingston*, 2022 UT 43, ¶ 29— that "any state interference with parents' right to encourage their children in the practice of religion . . . is subject to strict scrutiny." And they conclude by arguing that their right to encourage their children regarding religion was infringed during the case, specifically asserting that DCFS "cannot have made reasonable efforts to provide reunification services if it does not employ the least restrictive means available."

¶90 As examples of what they claim to have been "state interference" with their right to encourage the children in the practice of religion, Parents point to two things: (1) the rule Therapist put in place, at the behest of the children, that Parents not discuss religion with the children during family therapy sessions; and (2) the court's refusal to grant Father's request that Therapist be removed from the case and replaced with "a therapist more understanding of his religious beliefs."[10] We find Parents' arguments unpersuasive.

---

10. In addition to these two arguments, Mother complains—in passing, during the "constitutional" section of her brief—that the court improperly "utiliz[ed]" her "continued association with Father as evidence that she had failed to make adequate effort to adjust her conduct to substantially correct the circumstances that led to" the children's removal. But Mother does not develop this argument; in particular, she makes no attempt to explain how this argument might have constitutional dimension. As noted, *infra* ¶ 139, it is not improper for a juvenile court to take into account, in making a termination decision, the fact that a parent insists on continuing a relationship with an abusive person.

¶91 We first discuss Parents' arguments regarding the rule forbidding them from discussing religion during family therapy. In this case, we need not decide whether Parents' constitutional right to encourage their children in the practice of religion requires the State to allow Parents to offer such encouragement during therapy sessions provided by the State as part of reunification services. Nor do we need to decide—even assuming there is such a requirement—whether the rule imposed here satisfied strict scrutiny review by being "narrowly tailored to protect a compelling government interest." *Id.* ¶ 61 (quotation simplified). Given the record before us, we may avoid these questions because even assuming, for purposes of the discussion only, that there was a constitutional violation in this regard, any such violation was clearly harmless here. *See In re A.R.*, 2017 UT App 153, ¶¶ 11–13, 402 P.3d 206 (affirming the termination of a parent's rights in the face of an asserted constitutional violation because, even if the court committed constitutional error, the error was harmless); *see also In re I.M.L.*, 2002 UT 110, ¶ 9 n.3, 61 P.3d 1038 ("Generally, we avoid reaching constitutional issues if a case can be decided on other grounds."). The evidence presented at the termination trial showed that Father paid no heed to the rule in any event and simply went ahead—against the children's request, communicated through Therapist—and discussed religion with the children during the family therapy sessions.[11] Given Father's refusal to follow it, Parents do not explain how the rule's short-lived existence made any difference here; in particular, they make no effort to demonstrate how the therapy sessions would have been different or more productive had the rule not been in place. Moreover, and perhaps most significantly, the rule was only in

---

11. The rule also seemingly had little to no impact on Mother's therapy sessions with the children. Mother testified that she only remembered being told about the children's rules during the first two therapy sessions and, from her recollection, the children "brought all those things up" anyway.

effect for about five weeks, because the juvenile court ordered it removed at the first opportunity. As soon as Parents asked that the rule be removed, the court granted that request; Parents do not explain what the juvenile court could have done better or more speedily with regard to this rule. In short, we see no reasonable likelihood that the temporary imposition of a rule disallowing Parents to discuss religion during therapy sessions affected the outcome of the proceedings.[12]

¶92    Next, with regard to Parents' second example of asserted "state interference"—their claim that they had a constitutional right to a therapist whose religious beliefs matched their own— we likewise reject Parents' argument without entirely reaching its merits. Even if we assume—without deciding, and for purposes of the argument only—that Parents had a constitutional right to a therapist whose religious beliefs matched their own, Parents' argument on this point nevertheless fails because Parents have not explained exactly how—or even whether—Therapist's religious beliefs or practices differed from their own. The record is silent as to what Therapist's religion was—we therefore do not know whether she was a member of Parents' religion or not. And Father conceded, during his testimony, that his objection to Therapist was not based on whether she shared his religion or not, explaining that he doesn't "just look at a person on an LDS basis." He explained, instead, that he wanted the children to have a therapist who agreed with him on the "eternal values or principles" that he "believe[d] govern the universe." But in his

---

12. We also wonder whether there was any state action involved here at all, given that the rule in question was envisioned and requested by the children themselves. *See In re adoption of B.Y.*, 2015 UT 67, ¶ 16, 356 P.3d 1215 (stating that the constitution protects "against state action," not against "the actions of private parties"). But this issue was not briefed by the parties, and we therefore offer no opinion on the subject.

briefing, Father makes no effort to identify what those "values or principles" are, whether they derive from his religion or from some other source, or how they might have differed from Therapist's religious beliefs and practices.

¶93 Indeed, the GAL argues, with some force, that Father's objectionable behavior was not grounded in the tenets of any religion but, instead, simply amounted to Father's personal belief that, as head of the household, he had the right to bully and intimidate his children and to say whatever he wanted whenever he wanted during family therapy sessions. After all, even Father's own religious leader considered Father's similar behavior during the meeting at the church to be inappropriate and by no means compelled by tenets of their shared religion. And it is noteworthy that all four children—even after removal and despite the abuse and neglect they experienced—have remained steadfast adherents of the religion they share with Parents. Thus, one might reasonably conclude that Father's conflict with Therapist had nothing whatsoever to do with specific religious tenets and everything to do with Father's personality. At a minimum, Parents have not carried their appellate burden of persuading us that the situation is otherwise. And we note that courts have rejected similar claims in analogous cases on the basis that the parent had not "establish[ed] a clear relationship between" his or her "religious faith" and the specific "discipline" imposed on the children. *See, e.g., Jakab v. Jakab*, 664 A.2d 261, 265 (Vt. 1995); *see also In re H.M.*, 144 N.E.3d 1124, 1148 (Ohio Ct. App. 2019) (noting that the "record is scant on defining the parents' actual religious beliefs" and whether they motivated the behavior in question).

¶94 For these reasons, we see no constitutional infirmity in the juvenile court's refusal to grant Father's request for a different family therapist in this case.

¶95 We note again that Parents' overarching argument is that "the State could not have made reasonable efforts if its actions do not pass strict scrutiny."[13] Yet as to the two ways Parents allege that the State's actions do not pass muster, Parents have in one instance failed to show any actual infringement of a constitutional right, and in the other they have failed to persuade us that reunification services would have been more successful in the absence of the alleged constitutional violation. Thus, we perceive no error in the juvenile court's reasonable efforts determination, and we reject Parents' claims that, during the "juvenile court process," their constitutional rights were violated.

## II. Ineffective Assistance of Counsel

¶96 Next, Parents assert that they received ineffective assistance of counsel during the termination proceedings. "To establish [an] ineffective assistance of counsel claim, [a party] must show that counsel's performance was objectively deficient and that counsel's deficient performance prejudiced the case." *In re D.G.*, 2022 UT App 128, ¶ 9, 522 P.3d 39 (quotation simplified), *cert. denied*, 527 P.3d 1106 (Utah 2023). "Failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim," and therefore we are "free to address [Parents'] claims

---

13. While Parents couch their claim, at times, in the language of "reasonable efforts," we note that their claim is not a traditional challenge to a juvenile court's reasonable efforts determination. In particular, Parents do not directly argue that either of the two things they challenge—the requirement that they participate in family therapy with Therapist or the no-talking-about-religion rule—were not part of a "fair and serious attempt to reunify a parent with a child prior to seeking to terminate parental rights." *In re K.F.*, 2009 UT 4, ¶ 51, 201 P.3d 985 (quotation simplified).

under either prong." *In re C.M.R.*, 2020 UT App 114, ¶ 19, 473 P.3d 184 (quotation simplified).

¶97 Parents each make one argument in this regard. We first address Father's contention that his attorney was ineffective for not objecting to "improper bolstering evidence" presented during the termination trial. Second, we address Mother's argument that her attorney rendered ineffective assistance "by failing to object to" the terms of Mother's Plan. For the reasons set forth below, we conclude that neither Father nor Mother has borne their burden of establishing that their attorneys rendered ineffective assistance.

### A. Father's Claim

¶98 Father asserts that his attorney rendered constitutionally ineffective assistance by failing to object to certain testimony, offered by the State's witnesses during the termination trial, that Father characterizes as "improper bolstering evidence." Father points to three statements that he believes amounted to improper bolstering of the children's accounts of things that happened in the family home. First, he points to Therapist's statements that Chloe was "not exaggerating her symptoms or faking how she was feeling" when reporting suicidal ideations and seeking medication and that she was being "pretty honest" in her descriptions, as well as to Therapist's similar statement that the threats of suicide that Chloe and Felicity had made were not "fabricated" and were not "attention getters." Second, he complains about a different therapist's testimony that "there was never anything that [Noah] or [Hannah] told [her] relating to their experiences" at home "that would lead [her] to believe they were being dishonest." Finally, Father identifies Branch President's testimony that, during his communication with Chloe, Felicity, and Hannah in the August 2018 meeting, he had no concerns that "the girls were making these things up."

¶99   Father asserts that these statements were inadmissible and that a reasonable attorney would have objected to these statements in an effort to keep them out. He further asserts that, given the importance of the children's credibility to the issues before the court, the admission of these statements was ultimately prejudicial to him and led the court to believe the children's accounts over his own.

¶100   We have our doubts about whether a reasonable attorney would have objected to these statements, given the importance of many of them to therapeutic diagnosis and treatment. But even assuming, for the purposes of argument, that Father's attorney performed deficiently by not objecting to these statements, the admission of these statements did not prejudice Father on the specific facts of this case. To establish prejudice, Father must do more than "show that the errors had some conceivable effect on the outcome of the proceeding." *State v. Samora*, 2023 UT 5, ¶ 22, 529 P.3d 330 (quotation simplified). He bears the burden of demonstrating "that the decision reached would reasonably likely have been different absent trial counsel's alleged errors." *Id.* (quotation simplified). Father cannot meet that burden here.

¶101   By the time the termination trial rolled around, the court had already conducted numerous hearings in this case; most notably, it had held a five-day adjudication trial in which it had heard from the children and from various therapists and caseworkers, and it had already entered extensive findings and conclusions. In particular, as noted above, the court had already engaged in the process of determining whether Chloe and Felicity had felt genuine suicidal ideations, and concluded that they had; likewise, the court had already engaged in the process of determining whether Father had emotionally abused the children and concluded that he had. Given that the court had already made these findings, which were not substantively appealed, we cannot conclude that there is any reasonable likelihood that—absent the

challenged statements—the court would, at the termination trial, have changed its entire outlook on the events in the home and made antipodally different findings than the ones it had already made at the adjudication trial.

¶102 Under these circumstances, Father cannot demonstrate that he was prejudiced by any deficient performance on the part of his attorney. Accordingly, his ineffective assistance of counsel claim necessarily fails.

## B. Mother's Claim

¶103 Mother asserts that her attorney rendered constitutionally ineffective assistance by failing to object to the terms of Mother's Plan and to "the State's failure to provide the recommended services," and by not requesting a "modified service plan" better tailored to Mother's needs. According to Mother, "[r]easonable counsel would have understood the importance of the service plan and the services recommended by it," and she maintains that, if she had received the benefit of a modified plan, there is a "reasonable likelihood that the court would not have determined that Mother had failed to complete the services."

¶104 During the termination trial, the psychologist who evaluated Mother testified that Mother has dependent personality disorder, obsessive-compulsive personality disorder, and dementia, and that Mother might also suffer from aphasia but would need additional testing for that diagnosis to be confirmed. The psychologist opined that someone with Mother's conditions would likely experience some struggles in daily life and may need "assistance and accommodations." At the time, Mother's attorney did not object to Mother's Plan or assert that it should include any additional services to accommodate these diagnoses.

¶105 Now, however, Mother asserts that her attorney should have objected and should have requested that Mother's Plan

include additional services intended to assist Mother with these diagnoses and conditions. But here on appeal, Mother does not identify—let alone meaningfully discuss—any specific services she now wishes counsel would have requested, and she has therefore failed to demonstrate that she was prejudiced by counsel's failure to make a request. Without identifying any specific services she would have liked to have received, it is impossible for her to show that such services would have been reasonably likely to have made a difference here, especially in the face of the established facts: that Mother was steadfast in her loyalty to Father, that she at all times refused to acknowledge any responsibility for the situation, and that she failed to undertake efforts to remedy the circumstances that caused the children to be in an out-of-home placement.

¶106 Like Father, Mother has not borne her burden of demonstrating that she was prejudiced by any deficient performance on the part of her attorney. Accordingly, her ineffective assistance of counsel claim likewise fails.

### III. Challenges to the Juvenile Court's Factual Findings

¶107 Next, we address Father's assertion that a handful of the juvenile court's factual findings were clearly erroneous and unsupported by the evidence presented at the termination trial. Father identifies four such findings; we discuss each of them, in turn, and conclude that none of them are problematic.

¶108 First, Father challenges the court's finding that Chloe "spoke about suicidal thoughts while she lived at home." This finding is amply supported by the evidence presented at the termination trial. Chloe testified, on direct, that she had told Father that she was "suicidal," and that he responded by telling her that if she killed herself she would "go to hell." On cross-examination, she explained that she had told Father that, when he treats her "like crap," it makes her "feel like [she] just want[s] to

commit suicide." She did acknowledge that she made the comment in a kind of in-passing way, and that "it wasn't like [she] sat [Father] down and said, 'Dad this is a serious thing. I'm seriously considering [suicide].'" But this testimony is more than enough to support a finding that Chloe "spoke about suicidal thoughts while she lived at home."

¶109  Moreover, the court had already found, in the adjudication trial, that Chloe's suicidal ideations were genuine. In these earlier proceedings, the court had already learned that Parents had been informed of Chloe's feelings well before the children were removed from the home and that they had downplayed any concerns, calling Chloe a "drama queen" and indicating that they did not believe her. Under these circumstances, ample evidence supported the court's finding that Chloe spoke about her suicidal ideations while still living in Parents' home.

¶110  Second, Father challenges the court's characterization that Brother-in-Law testified that the children attended post-removal visits with Father "because it [was] what they [were] supposed to do and [they] [didn't] engage very well." Father asserts that the court's characterization of Brother-in-Law's testimony is inaccurate, and he points to a different statement Brother-in-Law made indicating that the children did not like the visits because "it interrupt[ed] their schedule." While it's true that Brother-in-Law said that the visits interrupted the children's schedule, the record also shows that he testified that the children were "not very engaged" during visits but "[t]hey underst[ood] that's what they [were] supposed to do, and so they [attended], begrudgingly sometimes, but they [were] there." We fail to see how the juvenile court's omission of Brother-in-Law's additional statement that the visits interrupted the children's schedule somehow renders the court's finding erroneous.

¶111 Third, Father challenges the court's statement that Noah testified that he would not feel "safe" at home. Father argues that this statement is erroneous because, as he sees it, Noah later "retracted that statement" and testified that he "didn't mean to say safe." Father then directs us to the portion of Noah's testimony he believes supports his position. At this point in his testimony, Noah was being asked about the circumstances surrounding Oldest Sister's departure from Parents' home. He was specifically asked what he meant by his statement that she left because it "wasn't safe." Noah then clarified that he "probably didn't mean to say safe" and that what he meant to convey was that Oldest Sister had gone through similar experiences to his own in living with Parents and that was the reason she left. But Noah's statement that he did not mean to say that Oldest Sister left because it was not safe is not a retraction of his earlier statement that it was his personal belief that Parents' house "wasn't a safe environment." Father mischaracterizes the record on this point and has fallen far short of persuading us that the court's finding on this issue was clearly erroneous.

¶112 Finally, Father challenges the court's finding that Brother-in-Law testified that the children "stopped hoarding food in their bedrooms." Father argues that the actual testimony was about "hiding" food—not "hoarding" food—and asserts that there was no evidence that the children were malnourished or underfed while in Father's care. We do not see a significant difference, in this context, between "hiding" food and "hoarding" food—however characterized, there is no question that the children secreted food in their bedrooms; Brother-in-Law explained that the children were "afraid to ask for more food" so they would take extra snacks to their bedrooms and "store" the food for later. Under these circumstances, we do not consider the court's characterization of the evidence to have been clearly erroneous.

¶113   Accordingly, we reject each of Father's challenges to the juvenile court's factual findings.

IV. Best Interest/Strictly Necessary

¶114   Finally, we address Parents' various challenges to the court's conclusions that termination of their rights was strictly necessary to promote the best interest of Hannah and Noah. Both Parents raise a direct challenge to the substance of the court's decision. In addition, Mother raises additional issues regarding the court's handling of the GAL's rule 59 motion. We first discuss Father's substantive challenge, and then separately discuss Mother's two arguments.

A. Father's Claim

¶115   Before the rights of any parent are terminated, the party seeking termination must establish (1) that "at least one of the enumerated statutory grounds for termination [is] present" and (2) that the "termination of parental rights [is] in the best interest of the affected children." *In re D.S.*, 2023 UT App 98, ¶ 16, 535 P.3d 843 (quotation simplified), *cert. granted*, Jan. 25, 2024 (No. 20230877). Parents do not challenge the juvenile court's determination that sufficient statutory grounds for termination are present, but they do challenge the court's conclusion that termination of their rights is in the children's best interest.

¶116   The best-interest inquiry is "wide-ranging" and "asks a court to weigh the entirety of the circumstances" of a child's situation, including "the physical, intellectual, social, moral, and educational training and general welfare and happiness of the child." *See In re J.M.*, 2020 UT App 52, ¶¶ 35, 37, 463 P.3d 66 (quotation simplified); *see also In re H.F.*, 2019 UT App 204, ¶ 14, 455 P.3d 1098 ("The best-interest test is broad, and is intended as a holistic examination of all the relevant circumstances that might affect a child's situation." (quotation simplified)).

¶117   Our legislature has mandated that termination of parental rights is permissible only when such termination is "strictly necessary." Utah Code § 80-4-301(1). Our supreme court has interpreted this statutory requirement to mean that "termination must be strictly necessary to promote the child's best interest." *See In re B.T.B.*, 2020 UT 60, ¶ 60, 472 P.3d 827. Indeed, a court's inquiry into the strict necessity of termination should take place as part of the best-interest inquiry that comprises the second part of the termination test. *See id.* ¶ 76 ("[A]s part of [the best-interest] inquiry, a court must specifically address whether termination is strictly necessary to promote the child's welfare and best interest."). And our supreme court has noted that

> this part of the inquiry also requires courts to explore whether other feasible options exist that could address the specific problems or issues facing the family, short of imposing the ultimate remedy of terminating the parent's rights. In some cases, alternatives will be few and unsatisfactory, and termination of the parent's rights will be the option that is in the child's best interest. But in other cases, courts should consider whether other less-permanent arrangements might serve the child's needs just as well.

*Id.* ¶ 67 (quotation simplified). "If the child can be equally protected and benefited by an option other than termination, termination is not strictly necessary." *Id.* ¶ 66.

¶118  In this case, the court seriously considered one non-termination option: imposing a permanent custody and guardianship arrangement in favor of Oldest Sister and Brother-in-Law. However, for various reasons, the court concluded that this option was not in the children's best interest, and therefore it

ordered termination of Parents' rights. Parents each challenge the court's conclusion in this regard.

¶119   With regard to Father, the court stated that it did "not find this alternative [of permanent custody and guardianship] to be in the children's best interest," and it offered "[a] couple of examples" to "illustrate the basis for this decision." First, the court pointed to both Psychiatrist and Branch President, and noted that they had each found Father's behavior to be so aberrant that they had taken action they'd never before taken: they sent letters to DCFS or to the court indicating their belief that Father was a danger to the children. Second, the court raised a concern about Father retaining residual parental rights, noting that, under a permanent custody and guardianship arrangement, Father "would still be in the orbit of" Hannah and Noah and could "assert[] his will as to basic medical and otherwise personal decisions in the care of the children."

¶120   Father challenges the court's best-interest determination, and he makes two arguments, one categorical and one fact-specific. First, Father asserts that parental rights can never be terminated where children are in a kinship placement, as these children are here with Oldest Sister. We reject this position. No Utah statute mandates this position, and we have never so held. *See In re A.H.*, 2022 UT App 114, ¶ 49, 518 P.3d 993 ("We stop well short of holding that, where an acceptable kinship placement exists, it can never be strictly necessary to terminate a parent's rights."), *cert. granted*, 525 P.3d 1279 (Utah 2023). To be sure, "[i]f there exists a completely appropriate kinship placement through which the family can remain intact, the 'strictly necessary' showing becomes significantly harder to make." *Id.* But such a showing is not impossible; indeed, staking out the categorical position Father advocates makes no sense in this context. It does not take much imagination to think of situations in which a parent's relationship with a child is so harmful and abusive that

it is strictly necessary, if the child's best interest is to be promoted, to permanently sever that relationship, regardless of whether the child is placed with a relative. We therefore reject Father's assertion that a parent's rights can never be terminated if the children are placed with a relative.

¶121   Second, Father takes issue with the court's residual rights concern. Here, Father points out that, in a permanent custody and guardianship situation, he would retain only four residual rights and duties: "(i) the responsibility for support; (ii) the right to consent to adoption; (iii) the right to determine the child's religious affiliation; and (iv) the right to reasonable parent-time unless restricted by the court." *See* Utah Code § 80-1-102(70)(a). Because the first of these is a duty and the last of these can be restricted by the court, Father asserts that we need be concerned only with the second and the third: Father's right to consent to adoption and his right to determine the children's religious affiliation. Father asserts that his residual rights would therefore not allow him to "assert his will" with regard to "basic medical and otherwise personal decisions," as the juvenile court stated.

¶122   We acknowledge Father's point, and we note our own recently expressed concern that juvenile courts may, in many cases, be overly concerned about parents retaining residual rights where permanent custody and guardianship arrangements are imposed. *See, e.g.*, *In re A.H.*, 2022 UT App 114, ¶ 55 (questioning "whether—in many cases . . . —a parent's desire to re-engage in their child's life should be viewed as negatively as the juvenile court appeared to view it"); *In re D.S.*, 2023 UT App 98, ¶¶ 23–24 (explaining why that case was "not one of those cases" in which "fear of a parent's residual rights might reasonably counsel in favor of terminating" a parent's rights).

¶123  But we also note, again, that we review best-interest determinations "deferentially," and we overturn them only if the

court "either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence." *In re D.S.*, 2023 UT App 98, ¶ 15 (quotation simplified). On a couple of recent occasions, we have reversed juvenile courts' best-interest/strictly-necessary decisions, even applying this deferential standard, because in our view "the evidence presented at trial did not constitute clear and convincing evidence that termination of [the parents' rights] would be in the best interest" of the affected children. *See In re A.H.*, 2022 UT App 114, ¶ 38; *see also In re D.S.*, 2023 UT App 98, ¶ 31 (stating that, "[i]n the end, the facts of this case simply don't add up to strict necessity"). But in other situations—like this one, for the reasons we discuss—the facts as presented at trial lend themselves to more than one possible conclusion. In such cases, our somewhat deferential standard of review will lead us to affirm, because either result will be supported by the facts of the case and will be within the discretion of the court.

¶124   In this vein, we draw an illustrative contrast between the facts of this case and the facts of *In re D.S.* In that case, the father was incarcerated, and he conceded that he was unable to care for his children and that therefore statutory grounds existed for termination of his parental rights. *See* 2023 UT App 98, ¶ 13. But he nevertheless resisted termination, asserting that it was not in the children's best interest for that to occur. *Id.* ¶ 15. He had maintained regular virtual visits with the children throughout his incarceration—visits that had gone fairly well, although the children sometimes were bored during the visits— and he expressed a desire to "have a stronger relationship with" his children upon his release. *Id.* ¶ 11. The children were placed with the father's own mother, who wanted to adopt them. *Id.* ¶¶ 9, 14. The juvenile court ordered the father's rights terminated because it viewed adoption by the paternal grandmother as offering "stability," and because it believed that adoption was necessary to "protect" the children "from [the father's] desire to

have ongoing and frequent visitation" after his release. *Id.* ¶¶ 13–14.

¶125   We reversed the termination order. We noted that "there is no indication that [the father's] continuing relationship with [the children] is harmful to them, rather than merely perhaps inconvenient." *Id.* ¶ 24. In particular, we noted that there were no allegations of abuse or neglect regarding the father, and that the children had been "found only dependent—not abused or neglected—as to him." *Id.* And we observed that, given "the absence of a 'harmfulness' component" to the father's relationship with the children, there was "no basis for the juvenile court's view that [the children] need 'protections against [the father's] commitment for increased and continued visitation.'" *Id.* ¶ 27. Relatedly, we noted the absence of any evidence that the father and the grandmother had "the sort of relationship where [the father] would be likely to exercise undue control over custody and care decisions in a guardianship arrangement." *Id.* ¶ 32.

¶126   Finally, we placed "almost no stock in" the juvenile court's reference to the desires of the children, for two reasons. *Id.* ¶ 29. First, the children were quite young—eleven and six—and the court had made no determination that they were old enough to offer a meaningful opinion as to the differences between adoption and guardianship. *Id.* Second, and more substantively, "the trial testimony did not support any finding on this issue more specific than that [the children]—quite understandably—wanted to remain in [their grandmother's] care." *Id.* ¶ 30. In particular, "no witness offered any testimony that could support a finding that either of [the children] actually understood and appreciated the distinction between adoption and guardianship, and that, based on that understanding, they preferred adoption." *Id.*

¶127 In this case, by contrast, the operative facts are quite different. First, and most importantly, there is a significant "harm" component to this case that was entirely absent in *In re D.S.* Here, the juvenile court found—after a lengthy adjudication trial—that all four minor children had "been emotionally abused" in a "continuing pattern of emotional maltreatment" by Father and that this "ongoing abusive environment [had] emotionally damaged the children." Father mounted no substantive appeal from these adjudicated facts, and he agrees that we must take those facts as they are. Moreover, Father failed to take advantage of any of the services provided to him to address his abusive behavior; indeed, the court found—in findings not appealed here—that Father had "made no efforts," or "only token efforts," to address and eliminate "the issues of emotional abuse which exist in the home." At the conclusion of the termination trial, the juvenile court therefore had every reason to believe that Father—if allowed a continuing relationship with the children—would continue his abusive behavior just as he had in the past. Under the particular circumstances of this case, the juvenile court's concern about residual rights was entirely justified.

¶128 Second, given the emotional abuse issues present here, there is also good reason to believe that Father—if allowed to retain residual rights—would leverage the fact that he still had parental rights to attempt to exercise undue control over custody and care decisions, and would not just limit his role to consenting to adoption and any change in religious affiliation. In the past, Father had attempted to exercise his domineering ways over Oldest Sister, even once "backhand[ing]" her when, as an adult, she declined his demand to clean his house during a visit. And the incident involving Father's attempt to interfere with Chloe's medical appointment—even after removal—is well-documented and has already been discussed. We therefore view the court's finding regarding Father's propensity to interfere in custody and care decisions as entirely supported by the record here.

¶129 Finally, the court in this case had strong evidence of what the children's individual desires were. Unlike in *In re D.S.*, all four of the children here, by the conclusion of the trial, were at least fourteen years old, and all of them were able to articulate clear opinions about what their desired outcome was. And all of them told the court, in no uncertain terms, that they wanted to be adopted by Oldest Sister and that they did not want to have any relationship with Father.[14] As noted below, the juvenile court was to give the children's desires in this regard "added weight." *See* Utah Code § 80-3-409(15).

¶130 For all of these reasons, then, we see no reversible error in the juvenile court's conclusion that, in this case, it was in the children's best interest for Father's parental rights to be terminated. Such a decision was within the discretion of the juvenile court and was supported by the record.

## B. Mother's Arguments

¶131 With regard to Mother, the court initially declined to terminate her rights, instead imposing a permanent custody and guardianship arrangement in favor of Oldest Sister. After consideration of the GAL's rule 59 motion, however, the court changed course and terminated Mother's rights along with Father's, concluding that it had failed to give the proper weight to the children's stated wishes for adoption.

¶132 Mother challenges the court's termination order on two grounds. First, she asserts that the court erred by allowing the GAL to submit evidence, in connection with the rule 59 motion, of certain post-trial events. Second, she mounts a substantive

---

14. In this case, Parents make no argument that any of the children were too young, or were for any other reason incompetent, to offer trial testimony about their desires regarding placement, adoption, and their ongoing relationship with Parents.

challenge, similar to Father's, to the court's conclusion that termination of her parental rights was strictly necessary to promote the children's best interest. We discuss these two arguments in turn.

1

¶133    After oral argument on the GAL's rule 59 motion, the court allowed the GAL to submit a "Report and Recommendation" that included an affidavit from Brother-in-Law describing events that had occurred after the termination trial. Mother believes that the court erred by considering this "new evidence" in reaching its decision to terminate Mother's parental rights. We take Mother's point that evidence of post-trial proceedings should ordinarily play no role in considering whether to grant a new trial. *See In re C.L.*, 2007 UT 51, ¶ 14, 166 P.3d 608 ("A motion for a new trial or amended judgment cannot be based on facts occurring subsequent to trial . . . ." (quotation simplified)). But even assuming, for the purposes of the argument, that the court erred by allowing the GAL to submit this evidence, any such error was harmless here because there is no indication that Brother-in-Law's affidavit played any role in the court's decision.

¶134    In its ruling granting the GAL's motion, the court included an introductory paragraph informing the parties that, before making its decision, it had "review[e]d" rule 59, "the filings and arguments of the parties," the "prior testimony from the termination trial," and its "original findings and order." The court made no specific mention of Brother-in-Law's post-argument affidavit. And later in its order, when setting forth the actual basis for its decision, it explained that it was amending its initial order because "the children's wishes or voice were not given proper weight" as mandated by governing statute. It noted again that it had reviewed its own "previous findings and conclusions" as well as "the trial testimony and exhibits," especially the children's

testimony in which they were "direct in seeking to be adopted" by Oldest Sister. In explaining the substance of its decision, the court made no mention at all of any post-trial events or of Brother-in-Law's affidavit, and it explained that the basis for its decision rested on entirely different grounds.

¶135　Under these circumstances, any error on the part of the court in allowing the submission of evidence of post-trial events did not affect the court's grant of the GAL's rule 59 motion. We therefore see no basis for reversal of the court's rule 59 decision in the arguably improper submission of Brother-in-Law's affidavit. *See State v. Loose*, 2000 UT 11, ¶ 10 n.1, 994 P.2d 1237 ("We do not reverse a trial court for committing harmless error.").

2

¶136　Next, Mother challenges the substance of the court's decision to terminate her parental rights. Here, we reach the same conclusion we reached in considering Father's similar challenge: while the juvenile court could potentially have imposed a permanent custody and guardianship arrangement on these facts, we perceive no reversible error in its conclusion that termination of Mother's rights was strictly necessary to promote the children's best interest.

¶137　As an initial matter, the court correctly interpreted the statutes governing a child's stated desires. Under Utah law, "if the minor desires an opportunity to address the juvenile court or testify," the court "shall . . . allow the minor" to do so. Utah Code § 80-3-108(4)(a)(ii). Moreover, when "determining whether termination is in the best interest of the child," the court should consider the relevant factors "from the child's point of view." *Id.* § 80-4-104(12)(b). The juvenile court heard from Hannah and Noah, and thereafter correctly noted that they "were straightforward in stating that they wished to be adopted by" Oldest Sister and Brother-in-Law. The court also noted that, when

a minor is fourteen years old or older, "the juvenile court shall give the minor's wishes added weight" and, if the court's decision "differs from a minor's express wishes," then the court must "make findings explaining" its decision. *Id.* § 80-3-409(15). At the time the court issued its ruling, Hannah was seventeen and Noah was fourteen; the statute thus required the court to give their wishes "added weight." And that is exactly what the court did. After further analyzing "the testimony and evidence from the trial on the termination petition, with emphasis on the children's testimony, and with further review" of the relevant statutes, the court was persuaded that its previous order should be amended and that Mother's parental rights should be terminated. We perceive no error in the court's procedure in this regard.

¶138 Mother further challenges the court's substantive decision, and we acknowledge that, with regard to her, certain factors weigh perhaps more in her favor—or, at least, not as strongly against her—than they do with regard to Father. Her relationship with the children was less actively harmful than Father's, and there is little if any evidence that she tended to attempt to manipulate her relationship with Oldest Sister. We therefore understand, at some level, the juvenile court's initial inclination to keep her relationship with the children intact, even while terminating Father's.

¶139 But ultimately, we agree with the State and the GAL that sufficient evidence exists in this record to support the juvenile court's reconsidered determination to terminate Mother's rights as well. There was evidence supporting the conclusion that Mother's relationship with the children was harmful, even if to a lesser extent than Father's. And Mother adamantly elected to remain in a relationship with Father, an adjudicated emotional abuser who refused to take steps to remedy the situation. We have previously noted that juvenile courts "have minimal empathy for parents whose strong emotional ties to their spouses or significant

others jeopardize their children's safety." *See In re T.M.*, 2006 UT App 435, ¶ 20, 147 P.3d 529; *see also In re G.B.*, 2002 UT App 270, ¶ 17, 53 P.3d 963 (upholding a juvenile court's finding that termination of a mother's parental rights was in the children's best interest where the mother continued to foster a relationship with the children's abusive father, "had no intention of separating from" him, and "continue[d] to deny that any abuse occurred"), *cert. denied*, 63 P.3d 104 (Utah 2002).

¶140  And the children were adamant that they wanted to be adopted and that they wanted no continuing relationship with Parents, a consideration to which the court was statutorily obligated to give "added weight." *See* Utah Code § 80-3-409(15). Mother appears to recognize that the juvenile court's decision came down to a "weighing of factors," asserting in her appellate brief that the court "performed an inappropriate weighing of factors." While a different judge might have weighed the factors differently and opted to keep Mother's relationship with the children intact, we cannot say that the juvenile court, on this record, committed reversible error by exercising its discretion in the opposite direction.

## CONCLUSION

¶141 In sum, Parents have not carried their burden of demonstrating any violation of their constitutional rights. Parents have also not established that either of their trial attorneys provided ineffective assistance. Additionally, we perceive no clear error in any of the challenged factual findings. The juvenile court's determination that termination of Parents' parental rights was strictly necessary to advance the children's best interest was supported by the record, and we perceive no reversible error in the court's grant of the GAL's rule 59 motion.

¶142  Affirmed.

_____